Daniel C. Girard (SBN 114826)
Jordan Elias (SBN 228731)
Elizabeth A. Kramer (SBN 293129)
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
dcg@girardgibbs.com
je@girardgibbs.com
eak@girardgibbs.com

Todd M. Friedman (State Bar No. 216752)
Adrian R. Bacon (State Bar No. 280332)
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
21550 Oxnard St., Suite 780
Woodland Hills, CA 91367
Tel: (877) 206-4741
*tfriedman@toddflaw.com*
*abacon@toddflaw.com*

*Counsel for Plaintiffs*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| IN RE HP PRINTER FIRMWARE UPDATE LITIGATION | Case No. 5:16-cv-05820-EJD-SVK<br><br>**CONSOLIDATED AMENDED COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

## OVERVIEW OF THE ACTION

1.      On September 13, 2016, thousands of HP printers in homes and small offices across the country failed in unison. These failures resulted from HP implementing a firmware update that disabled printers containing ink cartridges manufactured by HP's competitors. The failed HP printers displayed an error message that the ink cartridges were "damaged or missing" and should be replaced. But these printers' non-HP ink cartridges were neither damaged, missing, nor out of ink. HP devised and executed its firmware update as a means of gaining an advantage over its competition in the market for printer ink cartridges, which, over the life of a printer, typically cost more than the printer. HP did not announce its firmware update to consumers, and consumers did not anticipate it. With its update, HP acted by force to limit consumer choice and to take market share from its competition, instead of competing lawfully, based upon the quality and pricing of its ink cartridges.

2.      HP was aware of consumers' reasonable expectation that printers would operate using compatible replacement ink cartridges, regardless of who manufactured or sold these cartridges. HP recognized and reinforced this expectation. It encouraged consumers to "Say it best with HP ink," and its product warranty stated that the use of competing ink would not affect the warranty protections. Consumers relied on and expected to use more affordable, competing ink cartridges. The non-HP cartridges worked as expected until HP's firmware update. HP never disclosed to its customers that it could or would render their printers inoperable.

3.      HP's unfair methods of competition and deceptive trade practices harmed people who own its printers. HP has even announced that it considers itself free to carry out similar firmware updates in the future. Plaintiffs seek an injunction prohibiting HP from hijacking their printers again, and appropriate recovery for themselves and the other owners of HP printers affected by the firmware update.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (a) at least one member of the Class is a citizen of a state different from HP, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the Class includes more than 100 members, and (d) none of the exceptions under the subsection apply to this action.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b) because HP's principal place of business is here, and a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred here. HP executives and employees devised and carried out the scheme underlying these claims at HP's headquarters in Palo Alto, California.

### INTRADISTRICT ASSIGNMENT

6.      Assignment to the San Jose Division is proper under Local Rule 3-2(c) because a substantial part of the conduct at issue in this case occurred in Santa Clara County.

### PARTIES

7.      Defendant HP Inc. is a Delaware corporation headquartered in Palo Alto, California.

8.      Plaintiff Richard San Miguel is a citizen of Texas who resides in Seabrook, Texas.

9.      Plaintiff DeLores Lawty is a citizen of Washington who resides in Shelton, Washington.

10.     Plaintiff Richard Faust is a citizen of California who resides in El Dorado Hills, California.

11.     Plaintiff Christopher Ware is a citizen and resident of New Jersey.

12.     Plaintiff James Andrews is a citizen and resident of California, Los Angeles County.

### FACTS SPECIFIC TO PLAINTIFFS

#### Plaintiff Richard San Miguel

13.     In December 2015, San Miguel purchased an HP 8610 OfficeJet Pro printer. When the cartridges in his printer ran out of ink, he purchased replacement cartridges manufactured by an HP competitor. Those cartridges continued functioning up until September 12, 2016.

14.     On September 13, 2016, his HP printer unexpectedly failed; it stopped printing documents.

15.     HP caused this failure by disabling his printer.

16.     Immediately after his printer failed, its screen displayed a message directing him to remove "damaged" ink cartridges and replace them with new cartridges. A link to a website accompanied this message. He clicked on the link on his printer's screen. The link was to an HP website selling HP ink cartridges. The screen on his printer also indicated that his replacement color ink cartridges were empty, but they weren't.

17.     His printer's inoperability caused him to expend time and money.

18.     When he bought his HP printer, he relied on the ability to use third-party ink cartridges. Had he known that HP would prevent him from doing that, he would not have bought an HP printer, or he would have paid significantly less for it.

**Plaintiff DeLores Lawty**

19.     In February 2015, Lawty purchased an HP Officejet Pro 8620 printer, for $182.11. She uses her printer at home to print, among other things, photographs of her family, Veterans Affairs paperwork, and coupons. She had used HP printers in the past, and she purchased affordable third-party ink cartridges to replace the cartridges in those printers when they ran out of ink. She used the HP ink cartridges that came with the printer she purchased in February 2015 until around June 2016, when she replaced them with non-HP ink cartridges she purchased online. She successfully printed documents using those cartridges.

20.     She tried to use her HP printer on September 15, 2016, but it wouldn't work. The screen on the printer said there was an error with her ink cartridges. She checked her cartridges, and they were still full of ink.

21.     She replaced the cartridges with a new set of non-HP ink cartridges that she purchased from Amazon.com. They did not work.

22.     Confused, she spent several hours on the phone with HP trying to troubleshoot this problem. But she was unable to get her printer to work. She then bought a replacement printer from HP, for $141.43.

23.     HP caused her printer to fail by disabling it.

24.     She never allowed HP to push through its firmware update. Had she known that HP could or would disable her printer remotely, she would not have bought an HP printer, or she would have paid significantly less for it.

**Plaintiff Richard Faust**

25.     In 2014, Faust purchased an HP Officejet Pro X576dw printer for about $800. The printer came with HP ink cartridges.

26.     When the HP ink cartridges that came with his printer ran out of ink, he purchased and installed compatible ink cartridges made by an HP competitor. He also purchased a set of four new ink cartridges in January 2016 from Amazon.com for $100.99. He installed these cartridges—also made by an HP competitor—in his printer when his existing cartridges ran out of ink.

27.     He printed hundreds of pages of documents with these replacement cartridges, and expected to continue being able to do so.

28.     On or around September 16, 2016, he tried to use his printer, but it wouldn't work. An error message on the printer screen said that the ink cartridges were "missing or damaged."

29.     HP caused his printer to fail by disabling it.

30.     He spent about three weeks trying to resolve the printer error, including by buying replacement non-HP ink cartridges. His printer still wouldn't work.

31.     When investigating his printer problems online, he learned of an optional firmware update that HP had released and said would fix the problems. He downloaded the update, but still couldn't print documents.

32.     He then called HP and spent several hours working with HP technical support and on his own to try to fix the printer. Among the steps he took were: (a) downloading the updated firmware from an HP FTP site; (b) trying to load the updated firmware via a USB stick; (c) trying to install the updated firmware using two different computers; (d) uninstalling Windows 10 and trying to install the updated firmware using Windows 7; (e) giving HP remote access to his computer; (f) trying to install the updated firmware with and without ink cartridges installed; and (g) and running programs recommended by HP. Nothing got his printer to work again.

33.     He then elevated his complaint at HP to a supervisor in the technical support department. The supervisor said that he had seen many other similar cases, but couldn't help because the printer was out of warranty.

34.     Faust needs to print documents frequently. After his HP printer failed, he made more than a dozen trips to his office to print documents.

35.     On December 16, 2016, he purchased a Canon printer from Staples as a replacement for his HP printer.

CONSOLIDATED AMENDED COMPLAINT
Case No. 5:16-cv-05820-EJD-SVK

36.     Had he known that HP would disable his printer if he installed non-HP replacement ink cartridges, he would not have bought an HP printer, or he would have paid significantly less for it.

**Plaintiff Christopher Ware**

37.     In January 2012, Ware purchased an HP 8600 OfficeJet Pro printer from Amazon.com for $148.40. The printer came with starter color and ink cartridges.

38.     When the starter cartridges in his printer ran out of ink, he purchased non-HP ink cartridges for his printer. He successfully printed with those cartridges until mid-September 2016.

39.     In mid-September 2016, he tried to scan and print a document on his HP printer and received an error message stating, "There is a problem with the printer or ink system. Turn printer off, then on. If problem persists, contact HP." He turned his printer off and on, and still could not scan or print. He replaced the printer cartridges with another set of the non-HP ink cartridges he had purchased, and the printer still did not work.

40.     HP caused his printer to fail by disabling it.

41.     He twice tried to download the "patch" offered by HP to regain operability with certain non-HP printer cartridges, but was unable to do so.

42.     Believing his HP printer was broken, Ware went to Staples to purchase a new printer. He purchased a new non-HP printer for $151.59, while also purchasing some HP-branded printer cartridges to see if his HP printer would function with branded cartridges.

43.     After installing the HP printer cartridges, he was again able to use his HP printer to scan and print documents.

**Plaintiff James Andrews**

44.     When shopping for a printer, Andrews learned that the HP Officejet 4500 printer used 901 and 61 ink cartridges; HP represented on the product box that the printer used these models. The 901 and 61 labels are generic part numbers for cartridges that are compatible, because of their size and functionality, with his printer. HP never disclosed to him that he would not, in fact, be able to print documents using third-party ink cartridges.

CONSOLIDATED AMENDED COMPLAINT
Case No. 5:16-cv-05820-EJD-SVK

45.     When he bought the HP printer, he planned to use third-party ink cartridges because he knew that HP ink cartridges were much more expensive. When he bought the HP printer, he also understood that ink cartridges account for a large portion of the cost associated with the printer.

46.     Andrews believed that he would be able to use third-party ink cartridges in his HP printer. And in fact, after buying and setting up the printer, he was able to use third-party ink cartridges.

47.     After buying his HP printer, he purchased 901 and 61 ink cartridges from third-party sellers. When those cartridges ran out of ink, he either refilled them or bought new third-party ink cartridges.

48.     In November 2016, his printer began rejecting third-party ink cartridges and refills. When he inserted a new third-party ink cartridge, the printer showed an error code and would not print.

49.     He later learned that HP, though his computer, had forced a firmware modification that that froze his printer and prevented him from using third-party ink cartridges.

50.     He never permitted HP to modify his printer's firmware.

51.     To get his printer to work again, he had to buy new HP-branded ink cartridges at a considerably higher price than he paid for the non-HP cartridges he had bought.

52.     He relied to his detriment on HP's material representations and omissions that he would be able to buy third-party ink cartridges and use them in his printer.

53.     He would not have bought the HP printer if he had known that HP's representations were false or that HP would forcibly control and modify his printer.

54.     HP made the same or similar false representations and omissions for all HP Officejet 4500 printers like the one he bought, as well as the other Class Printers listed below.

## COMMON FACTUAL ALLEGATIONS

### HP's Printer and Printer Ink Business

55.     HP sells computers, printers, and printer services. Printers and printer ink account for nearly half of HP's business.

56.     HP obtains little or no profits from its printer sales.

57.     HP obtains substantial profits from its sales of printer ink cartridges.

58.     In HP's printer business, HP obtains most of its profits from selling ink cartridges used in HP printers.

59.     These ink cartridges are generally priced at $20 to $99 per ounce ($2,618 to $12,608 per gallon). The cost of ink cartridges generally constitutes a substantial portion of the total cost of the printer housing the cartridges.

60.     Competing manufacturers sell printer ink cartridges that are compatible with HP printers and are priced well below the corresponding HP cartridges. To save money, HP printer owners often buy non-HP cartridges.

61.     Microchip technology allows HP to detect whether HP printers are using HP or non-HP cartridges.

62.     Because the Class Printers connect to the Internet, HP can communicate with HP printers after it sells them. One way to communicate with printers is by updating their firmware.

**The Class Printers**

63.     Subject to information learned in discovery, the Class Printers comprise HP printers and all-in-one devices, which perform some combination of printing, copying, scanning, and faxing, in the following products and product series:

- HP OfficeJet printer series 4500, 6220, 6230, 6810, 6820, 8600
- HP OfficeJet Pro printers 8610, 8616, 8620, 8625, 8630, 8640, 8660, 251dw, 276dw
- HP Officejet 6600 e-All-in-One Printer – H711a/H711g (CZ155A) and (CZ162A)
- HP OfficeJet e-All-in-One printers 6812, 6815, 6830, 6835, 8600, 8610, 8615, 8620
- HP OfficeJet Pro e-All-in-One – N911a
- HP OfficeJet Pro 8600 Plus e-All-in-One – N911g
- HP Officejet Premium e-All-in-One Printer 6700 H711n (CN583A) and 8600
- HP Officejet 6100 ePrinter – H611a (CB863A)
- HP Officejet 7110 Wide Format ePrinter – H812a (CR768A)
- HP OfficeJet 7510 Wide Format All-in-One Printer (G3J47A)
- HP Officejet Wide Format e-All-in-One 7610 (CR769A) and 7612 (G1X85A)
- HP OfficeJet Pro 6230 e
- HP OfficeJet Pro 8100 e – N811a/N811d
- HP OfficeJet Pro X series including X451dn Printer (CN459A), X451dw (CN463A), X456dn, X456dw
- HP Officejet Pro Multifunction Printers X476dn (CN460A), X476dw (CN461A), X576dw (CN598A), X551dw (CV037A)

64.     These products are collectively referred to herein as "Class Printers."

65.     People typically use Class Printers in homes or small offices.

66.     The Class Printers depend on ink cartridges for the ink with which they print documents.

67.     HP obtains a significant portion of its printer ink revenue from sales of replacement ink cartridges for the Class Printers.

68.     When it sold the Class Printers, HP made the same or similar misrepresentations and omissions with respect to each Class Printer.

69.     HP made the same or similar misrepresentations and omissions with respect to each Class Printer when it eliminated Class Printers' compatibility with third-party ink cartridges.

70.     HP's firmware update was a single act that disabled all Class Printers' ability to function with third-party ink cartridges.

**HP's Motives for Carrying Out Its Injurious Firmware Update**

71.     HP printers and compatible ink cartridges contain chips that allow the printer and ink cartridge to communicate with each other. During these communications, through the use of key codes, the printer authenticates that the cartridge is compatible with it. The printer chip contains a master key code; the cartridge chip contains a base key code that is derived from the master code.

72.     HP has sought to enforce its alleged intellectual property rights associated with ink cartridges against alleged infringers. Whether attempting its enforcement under trade secret law or patent law, HP has generally been unsuccessful.

73.     In the Northern District of California, HP brought and voluntarily dismissed a lawsuit against Datel for allegedly misappropriating trade secrets concerning key codes. *Hewlett-Packard Co. v. Datel Holdings Ltd.*, No. 14-cv-02891-EJD (N.D. Cal. filed June 23, 2014) (voluntarily dismissed on Feb. 6, 2015). HP also brought and voluntarily dismissed a suit against Ninestar and Apex for making ink cartridge chips that allegedly infringed three HP patents. *Hewlett-Packard Co. v. Ninestar*, No. 14-cv-04473-HSG (N.D. Cal. filed Oct. 6, 2014) (voluntarily dismissed on May 6, 2015).

74.     HP's IP enforcement efforts in Europe have been similarly unsuccessful. In late 2015, HP lost a patent suit in the Netherlands against Digital Revolution, a Dutch maker of third-party ink cartridges that HP unsuccessfully claimed infringed a European ink cartridge chip patent similar to the

CONSOLIDATED AMENDED COMPLAINT
Case No. 5:16-cv-05820-EJD-SVK

patents at issue in the *Ninestar* case. *Hewlett-Packard Co. v. Digital Revolution BV* [d.b.a. 123inkt], Case No. C/09/483615 / HA ZA 15-245, The Hague (Netherlands) (decided Nov. 25, 2015).

75.     According to its annual reports and other SEC statements, HP's revenues from sales of printer ink have declined in each year since at least 2013. In its 10-Q statement filed with the SEC for the third quarter of 2016, HP reported an 18 percent decline in year-over-year revenue from sales of printer ink.

76.     HP was motivated to boost its earnings from sales of ink cartridges by directly disabling printers and ink cartridges and by conditioning the continued use of HP printers on purchases of its own cartridges.

## HP's Injurious Firmware Update

77.     On September 13, 2016, thousands of Class Printers throughout the United States simultaneously failed.

78.     Failed Class Printers displayed the following error message:



CONSOLIDATED AMENDED COMPLAINT
Case No. 5:16-cv-05820-EJD-SVK

79.     But these failures did not result from any problem or error with the ink cartridges in the Class Printers. Despite HP's error message, these ink cartridges were neither missing nor damaged.

80.     HP's firmware update changed the communication protocol between HP printers and microchips located in both HP-branded ink cartridges and third-party cartridges so that certain varieties of third-party inkjet cartridge microchips, including those manufactured and distributed by Apex Microelectronics, could no longer communicate with the HP printer. The firmware blocked ink cartridges containing these chips from functioning in an HP printer.

81.     Failed Class Printers still don't work, except where they have been loaded with HP ink cartridges.

82.     HP has engaged in this type of conduct before. HP employs a technology it refers to as "dynamic security" to alter the communication protocol between HP printers and ink cartridges. Dynamic security can be installed on printers via firmware updates and was designed to trigger protocol changes at specified intervals over time.   Even before September 2016, a firmware update containing dynamic security targeted microchips manufactured by HP's competitors, including Static Control Components, and prevented third party inkjet cartridges from working in HP printers.

83.     HP's deployment of dynamic security through firmware updates has disrupted the marketplace in the inkjet cartridge and refill market, by systematically disabling technology lawfully reengineered by third-party ink cartridge makers who sell their products in the same market as HP. These firmware updates rendered third-party products obsolete with the click of a button. These updates harmed competition and caused consumers to pay more for HP products.

**HP's Scheme to Repel Competition and Limit Consumer Choice**

84.     HP purposely caused Class Printers with non-HP ink cartridges to fail.

85.     The failure of Class Printers on the same day resulted from code that HP wrote and installed.

86.     Through its firmware updates containing dynamic security, including the trigger that occurred in September 2016, HP sought to repel competition from more affordable ink cartridges on the market. The purpose of HP's update was to disable HP printers containing non-HP ink cartridges. By

1   doing so, HP sought to induce more consumers to buy HP's higher-priced cartridges and to reduce the

2   market share of its ink cartridge competitors.

3          87.    HP carried out this scheme to restrict the choices available to its customers, cause them to

4   purchase more HP products, and protect HP's profits from sales of non-HP products.

5          88.    HP's conduct in disabling Class Printers prompted a flurry of complaints and criticism

6   from consumers, advocacy groups, and others, both nationally and internationally.[1]

7          89.    On September 28, 2016, Jon Flaxman, the Chief Operating Officer of HP, issued a public

8   statement apologizing for HP's conduct.[2] Flaxman stated, "We should have done a better job of

9   communicating about the authentication procedure to customers, and we apologize. … Again, to our

10  loyal customers who were affected, we apologize."

11         90.    Flaxman further indicated the HP might engage in similar conduct in the future: "We will

12  continue to use security features to protect the quality of our customer experience, maintain the integrity

13  of our printing systems, and protect our IP including authentication methods that may prevent some third-

14  party supplies from working."

**HP's Inadequate Remedial Offer**

16         91.    On October 12, 2016, Flaxman revised his statement of September 28, 2016, to add a

17  notification regarding an optional firmware update that customers could download.

18         92.    HP's notice of its remedial update did not fully and clearly disclose which printers and ink

19  cartridges its firmware update impaired.

20         93.    HP has failed to adequately make Plaintiffs and Class members aware that an update

21  purporting to reverse the printer disablement is available. HP did not directly inform affected consumers

22  of this remedial offer. Instead, HP modified its corporate statement that was already posted on the

23  Internet.

---

25  [1] *E.g., HP Launched Delayed DRM Time Bomb to Disable Competing Printer Cartridges*,
    https://www.techdirt.com/articles/20160920/07021035568/hp-launched-delayed-drm-time-bomb-to-disable-competing-printer-
26  cartridges.shtml (last visited Mar. 16, 2017); *EFF calls on HP to disable printer self-destruct sequence*,
    http://arstechnica.com/information-technology/2016/09/hp-should-apologize-and-stop-sabotaging-non-hp-ink-cartridges-eff-says/ (last
    visited Mar. 16, 2017).

27  [2] *Dedicated to the best printing experience*, http://www8.hp.com/us/en/hp-news/blog/Small-Business-Printing/best-possible-printing-
    experience.html?source=aw&aid=7168&jumpid=af_6mrc7uxaeb&awc=7168_1475273723_78f4d01e0844c1ceeab6b6cee5a4b2d7&aoid=
28  35252&pbid=291795&siteid=http%3A%2F%2Fwww%2Edigitaltrends%2Ecom%2F (last visited Mar. 16, 2017).

94.     Unlike the printer-disabling firmware update that HP installed remotely, its remedial update is not automatic. It is available only as an optional download.

95.     In the industry, HP's printer-disabling firmware update is known as a "push"—meaning HP forced this update onto its customers' products by automatically installing the update on every printer in the market that was connected to an operating system and the Internet. The term "push" refers to HP's act of pushing (or forcing) all such printers to be updated with new firmware.

96.     Even as HP insists that he can push through future firmware updates, HP's remedial measure requires customers to "pull" a new firmware update from HP's website in an affirmative act. Before customers could install this update, they had to find out about it on their own, browse the Internet to locate it, and download it to their computers.

97.     Ordinary consumers had no way of learning about HP's remedial update because HP buried its notice of this update on its website, with very limited notice to consumers.

98.     A very small percentage of HP inkjet printer owners (the Class members here) actually downloaded and installed HP's remedial update. Yet all of those Class members were injured by the firmware update that HP pushed onto their devices.

99.     HP's remedial update is inadequate to restore printer functionality. Even consumers who were able to download and install HP's remedial update cannot use their Class Printers to print and scan documents.

100.    HP's act of requiring consumers to pull an inadequate remedy when it should have pushed through an adequate one is oppressive, harmful to competition, and unlawful.

**HP's Warranty**

101.    HP's express warranty accompanying the Class Printers (the "Warranty") contemplates the use of non-HP-manufactured replacement cartridges in HP printers.

102.    The Warranty provides, "The use of a non-HP or refilled cartridge does not affect either the HP Limited Warranty to the end-user customer or any HP support contract with the end-user customer for the printer." This language reinforced consumers' ordinary custom, expectation, and practice of printing documents with Class Printers using compatible non-HP ink cartridges.

103.    Additionally, under the Warranty, HP's technical support services do "NOT include assistance with … installation of non-HP software purchased separately," but "non-HP manufacturers and suppliers or publishers may provide their own warranties directly to you."

104.    HP's disablement of Class Printers caused HP to profit from servicing products that had failed by design.

## CLASS ACTION ALLEGATIONS

105.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23 on behalf of the following Class and Subclasses (unless otherwise specified, the "Class"):

### The Injunctive Relief Class

All persons in California who own a Class Printer.

### The Disablement Class

All persons in the United States who purchased a Class Printer and experienced a print failure while using a non-HP aftermarket cartridge during the period between March 1, 2015 and December 31, 2017.

### The Texas Subclass

All persons in Texas who purchased or owned one or more Class Printers.

### The Washington Subclass

All persons in Washington who purchased or owned one or more Class Printers.

### The New Jersey Subclass

All persons in New Jersey who purchased or owned one or more Class Printers.

Excluded from the proposed Class and Subclasses are HP's officers, directors, legal representatives, successors, and assigns; any entity in which HP has a controlling interest; and judicial officers to whom this case is assigned and their immediate family members.

106.    Plaintiffs reserve the ability to modify the definition of the proposed Class before the Court determines whether class certification is warranted.

107.    The requirements of Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3) are met in this case.

108.   <u>Numerosity</u>. The Class consists of thousands of owners of Class Printers, making joinder of each Class member impracticable. The Class is presently ascertainable by reference to objective criteria and based upon records within HP's possession.

109.   <u>Commonality and Predominance</u>. Common questions of law and fact exist for each of the causes of action and predominate over questions affecting only individual Class members. Questions common to the Class include:

a.   Whether HP's acts and practices constitute unfair methods of competition;

b.   Whether HP engaged in unfair acts or practices in the conduct of trade;

c.   HP's motives for devising and executing its forced modification of Class Printers;

d.   Whether and to what extent HP profited both from the initial sale of Class Printers and from the consequences of HP's forced modification;

e.   Whether HP engaged in deceptive business practices at the point of sale with respect to the Class Printers;

f.   Whether HP made material misrepresentations and omissions with respect to the printers originally sold to Plaintiffs and Class members;

g.   Whether HP engaged in deceptive business practices in the aftermarket and when forcibly modifying Plaintiffs' and Class members' printers;

h.   Whether HP's remedial offer is inadequate or inadequately disclosed;

i.   Whether HP violated Cal. Bus. & Prof. Code §§ 17200, *et seq.*, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, and Cal. Civ. Code §§ 1750, *et seq.*;

j.   Whether HP violated the consumer protection statutes of Texas, Washington, and New Jersey;

k.   Whether HP violated the Consumer Fraud and Abuse Act and the California Computer Crime Law;

l.   Whether HP's conduct constitutes trespass to chattels;

m.   Whether HP's conduct constitutes tortious interference with contractual relations and/or prospective economic advantage;

n.   Whether Plaintiffs and Class members are entitled to equitable relief;

o. Whether HP's unlawful, unfair, and deceptive practices harmed Plaintiffs and Class members;

p. Whether HP's conduct is substantially injurious to owners of its products;

q. The method of calculation and extent of damages for Plaintiffs and Class members; and

r. Whether Plaintiffs and the Class are entitled to restitution and, if so, in what amount.

110. <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all Class members, purchased Class Printers that HP unilaterally disabled and rendered inoperable. Each Class member's claims arise from the same tortious conduct of HP. All Class members were exposed to the same misrepresentations and omissions.

111. <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests do not conflict with the interests of Class members, and they have retained counsel experienced in prosecuting class action and consumer protection litigation.

112. In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3).

113. <u>Superiority</u>. A class action is superior to individual adjudications of this controversy. Litigation is not economically feasible for individual Disablement Class members because the amount of monetary relief available to individual plaintiffs is insufficient in the absence of the class action procedure. Separate litigation could yield inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. A class action presents fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damage claims of Disablement Class members can be readily managed given the uniform claim elements and similar types of harm at issue.

114. Class certification also is appropriate under Rule 23(b)(1) or (b)(2) because:

a. the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for HP;

b.     the prosecution of separate actions by individual Class members would create a risk of adjudication of their rights that, as a practical matter, would be dispositive of the interests of other Class members not parties to such adjudications or would substantially impair or impede other Class members' ability to protect their interests; and

c.     HP has acted and refused to act on grounds that apply generally to the Injunctive Relief Class such that final injunctive relief or declaratory relief is warranted with respect to that Class as a whole.

**FIRST CLAIM FOR RELIEF**
**Unfair and Unlawful Business Practices in Violation of the Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of the Injunctive Relief Class)**

115.   Plaintiffs incorporate the above allegations by reference.

116.   HP's unlawful and unfair conduct resulted from policies that HP contrived, ratified, and implemented in California.

117.   HP's conduct is unlawful, in violation of the UCL, because it contravenes the legislatively declared policy against unfair methods of business competition. Additionally, HP's conduct is unlawful because, as set forth below, it violates the False Advertising Law, the Consumer Legal Remedies Act, the Consumer Fraud and Abuse Act, and the California Computer Crime Law, and constitutes trespass to chattels and tortious interference with contractual relations and/or prospective economic advantage.

118.   HP engaged in unfair methods of competition and unfair trade practices that violate the UCL, in at least the following respects:

a.     With the intent and effect of stifling open and vigorous competition in the market for printer cartridges, HP devised and executed a material change to printers it had sold.

b.     HP intentionally caused HP printers to stop functioning upon detection of cartridges manufactured by HP's competitors.

c.     HP conditioned the operation of HP printers on their owners' purchases of HP products in another product market.

d.      HP tied HP printers' functionality to their owners' purchases of HP cartridges even though HP's Warranty expressly contemplates that printer owners may, will, and do replace depleted printer cartridges with cartridges not made or sold by HP.

e.      HP rendered printers it had sold inoperable without prior notice to their owners.

f.      HP printers remain inoperable as a result of HP's conduct unless their owners purchase and install cartridges made and sold by HP.

g.      By forcing Plaintiffs and Class members to purchase HP-branded ink cartridges to regain a working printer, HP has obtained an unfair advantage in the marketplace and hindered competition for third-party ink cartridges.

h.      By rendering the use of third-party ink cartridges in Class Printers obsolete, HP, through its firmware update, has unfairly usurped the business of third-party ink sellers and required Plaintiff and Class members to pay around three to six times more for replacement ink cartridges than they otherwise would have paid.

i.      To induce purchases of HP cartridges, HP provided misleading written messages on the screens of all of the failed Class Printers directing their owners to replace non-HP cartridges that, in fact, still contained ink and, but for HP's conduct, would function in an ordinary manner.

j.      HP's conduct was designed to increase and maintain its share of the printer cartridge market due to conditions separate from competitive factors like pricing and quality of goods.

119.    HP acted to inhibit competition in a manner that is unfair and substantially injurious to the consuming public. HP's unfair methods of competition and unfair acts and practices are contrary to California law and policy and constitute unscrupulous, unethical, outrageous, and oppressive business practices.

120.    HP has indicated that it considers itself free to commit similar injurious acts of unfair competition in the future. It should be enjoined from doing so pursuant to Business and Professions Code section 17203.

121.    The gravity of the harm resulting from HP's conduct detailed above outweighs any possible utility of this conduct. There are reasonably available alternatives that would further HP's

legitimate business interests, such as refraining from disabling printers that contain ink cartridges manufactured by other companies.

122.    Plaintiffs and Class members could not have reasonably avoided injury from HP's unfair business conduct. Plaintiffs and Class members did not know, and had no reasonable means of learning, that HP would unilaterally disable their printers upon detecting ink cartridges manufactured by HP's competitors.

123.    As a direct and proximate result of HP's conduct, Plaintiffs and Class members have suffered injuries-in-fact, including because:

a.    While Plaintiffs and Class members depend on their printers to transact business and manage important aspects of their personal and family lives, HP's unfair methods of competition and unfair acts and practices have thwarted and deprived them of the use of their printers.

b.    HP's unfair methods of competition and unfair acts and practices have prevented Plaintiffs and Class members from making purchasing decisions on the basis of competitive factors in the marketplace for consumer and business goods.

c.    HP's unfair methods of competition and unfair acts and practices have caused Plaintiffs and Class members to incur lost time and out-of-pocket costs for, among other things, replacement printers and printer cartridges.

d.    HP's unfair methods of competition and unfair acts and practices have prevented Plaintiffs and Class members, who had bought HP printers, and who otherwise would have bought third-party ink cartridges in the future, from doing so while requiring them to buy higher-priced HP ink cartridges—at considerable added expense, and in contravention of their reasonable expectations and practices—to regain functioning printers.

e.    As a result of HP's unfair methods of competition and unfair acts and practices, Plaintiffs and Class members who bought third-party ink cartridges lost the valuable use of those products before the end of their useful life.

f.    HP's unfair methods of competition and unfair acts and practices have caused Plaintiffs' and Class members' printers to suffer a loss in value.

124.    All of HP's unlawful and unfair conduct occurred during HP's business and was part of a generalized course of conduct. HP's decision to disable Class Printers originated in HP's operations, sales, and marketing divisions within the State of California.

125.    Plaintiffs and the Class accordingly are entitled to relief as provided for under the UCL, including restitution, declaratory relief, and a permanent injunction prohibiting HP from committing these violations and requiring HP to reverse its unfair and unlawful disablement of Class Printers. Plaintiffs also respectfully seek reasonable attorneys' fees and costs under applicable law, including California Code of Civil Procedure section 1021.5.

**SECOND CLAIM FOR RELIEF**
**Fraudulent Business Practices in Violation of the Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, _et seq._**
**(On Behalf of the Class)**

126.    Plaintiffs incorporate the above allegations by reference.

127.    HP's conduct violates the UCL's prohibition of fraudulent business practices.

128.    HP's fraudulent conduct resulted from policies that HP contrived, ratified, and implemented in California.

129.    To induce purchases of HP printers, HP made misleading statements in its advertisements and product warranty that deceived Plaintiffs and Class members and reinforced their reasonable expectation and belief that they could use compatible non-HP ink cartridges to print documents with Class Printers.

130.    A reasonable consumer would expect to be able to use a compatible ink cartridge in a printer regardless of which company or companies manufactured and sold it.

131.    At the time Plaintiffs and Class members purchased their Class Printers, HP was aware of consumers' widespread and common practice of using compatible—and more affordable—third-party ink cartridges as replacements. HP deliberately furthered, fostered, and reinforced this expectation through uniform misrepresentations and material omissions.

132.    HP's uniform listing of ink cartridge model numbers on the product box communicated to reasonable consumers that the printers would operate with third-party ink cartridges in those model lines. HP's uniform advertising statement inside the product box to "Say it best with HP ink" further

19

communicated to reasonable consumers that the printer would operate with third-party ink cartridges. The statement implied that people could use other brands of ink, because there would have been no need for HP to encourage people to "say it" with HP ink if that was their only option.

133.    Likewise, HP's uniform statement in its Warranty that the warranty protections and promises would apply *even if* consumers used non-HP ink cartridges communicated to reasonable consumers that the printers would, in fact, operate with non-HP cartridges.

134.    These multiple statements, together with (a) consumers' existing reasonable expectations to be able to use third-party cartridges (as they were, in fact, able to until HP's firmware update), and (b) HP's suppression of the true and material fact that printers fitted with third-party cartridges would be disabled, completed HP's deceptive scheme.

135.    HP's conduct had a strong tendency and likelihood to deceive reasonable consumers. HP's conduct misled, deceived, and tricked Plaintiffs and Class members into purchasing HP printers they would not have purchased in the absence of HP's deception.

136.    When they purchased HP printers, Plaintiffs and Class members reasonably relied to their detriment on HP's misleading statements in its advertisements and product Warranty. These statements deceived Plaintiffs and Class members by, among other things, reinforcing their reasonable expectation and belief that they could rely on compatible non-HP ink cartridges to print documents in Class Printers.

137.    The ability to use compatible printer ink cartridges made by a third party was material and highly important to Plaintiffs and Class members in deciding to purchase Class Printers.

138.    HP had a duty to clearly and conspicuously disclose to Plaintiffs and Class members that it considered itself free to disable printers using compatible third-party ink cartridges, because (a) a reasonable consumer would find this information highly important and material to the decision of whether to purchase an HP printer instead of another brand of printer, and (b) a reasonable consumer would expect that, unless otherwise informed, he or she would be able to use third-party ink cartridges with the HP printer.

139.    The ability to use third-party ink cartridges is a product attribute that reasonable consumers have come to expect in the marketplace as common and prevalent across most, if not all, brands and models of printers. Third-party cartridges are significantly more affordable than HP-branded

ink cartridges. Reasonable consumers therefore would find it highly important and material at the time they purchased an inkjet printer that the brand they were purchasing was not or would not be compatible with third-party ink cartridges.

140. HP breached its duty to disclose by concealing its intent to preclude the use of compatible third-party ink cartridges and to disable Class Printers containing them. At no time before Flaxman's apology did HP inform Plaintiffs and Class members that Class Printers could or would be disabled if they were fitted with non-HP ink cartridges. HP instead concealed and suppressed the true facts regarding its scheme to impair these products.

141. As indicated above, ink cartridges represent a significant cost over the lifetime of Class Printers. HP improperly exploited the goodwill of its competitors that allow the use of third-party ink cartridges, to induce Plaintiffs and Class members to believe that they would be able to use third-party ink cartridges and thus pay significantly less than what they now, as a result of HP's violations, need to pay for replacement cartridges.

142. HP caused Plaintiffs and Class members to forgo purchasing printers from other brands due to its false representations and concealment of material facts.

143. At the direct expense of Plaintiffs and Class members, HP benefited and profited from its false representations and concealment of material facts. As a direct and proximate result of HP's deception, more consumers purchased HP printers in the first place because they were not informed that HP would carry out its disabling firmware update in the future. Had HP disclosed that it would, or believed that it permissibly could, remotely disable printers containing compatible third-party ink cartridges, a large percentage of consumers who purchased Class Printers would not have done so, and, in turn, never would have purchased HP-branded ink cartridges.

144. HP's wrongful and injurious deception continued when it disseminated its printer-disabling firmware update.

145. To induce purchases of HP-branded ink cartridges, HP intentionally caused the Class Printers to display error messages stating, among other things, that existing ink cartridges in the printers were "damaged or missing" and should be replaced. These statements were false and misleading. The non-HP ink cartridges in Class Printers were neither damaged, missing, nor out of ink.

146.    HP's misleading error messages had a strong tendency to, and actually did, deceive Plaintiffs and Class members.

147.    Plaintiffs and Class members reasonably relied to their detriment on HP's misleading error messages. HP's misleading error messages caused actual harm to Plaintiffs and Class members by inducing them to purchase new ink cartridges before their existing cartridges had run out of ink. Plaintiffs and Class members purchased both HP cartridges and non-HP cartridges as a direct and proximate result of HP's misleading error messages.

148.    All of HP's misleading and fraudulent conduct occurred during HP's business and was part of a generalized course of conduct. HP's material misrepresentations and omissions set forth above originated in HP's operations, sales, and marketing divisions within the State of California.

149.    Plaintiffs and the Class accordingly are entitled to relief as provided for under the UCL, including restitution, declaratory relief, and a permanent injunction. Plaintiffs also respectfully seek reasonable attorneys' fees and costs under applicable law.

### THIRD CLAIM FOR RELIEF
**Violations of the False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
**(On Behalf of the Class)**

150.    Plaintiffs incorporate the above allegations by reference.

151.    HP violated the FAL by using false and misleading statements, and material omissions, to promote the sale of Class Printers.

152.    Class Printers do not possess the level of quality or value that HP promised.

153.    HP made uniform representations and material omissions that communicated to Plaintiffs and Class members that Class Printers were compatible with generic third-party ink cartridges, when that was not in fact true.

154.    HP sold printers advertised to include particular features and functions and then, without Plaintiffs' and Class members' consent, forcibly removed the originally advertised features and functions.

155.    HP knew, or in the exercise of reasonable diligence should have known, that its representations and omissions were false and misleading at the time it made them. HP deliberately

provided false representations and omissions to deceive reasonable consumers in the market for an inkjet printer.

156.    HP's false and misleading advertising of Class Printers as compatible with generic third-party ink cartridges deceived the general public.

157.    As a direct and proximate result of HP's misleading and false advertising, Plaintiffs and Class members have suffered injury-in-fact and have lost money and property. Plaintiffs and Class members reasonably relied to their detriment on HP's material misrepresentations and omissions that Class Printers would be compatible with, and could be used with, replacement third-party ink cartridges. Plaintiffs and Class members received products that were materially different than advertised: the Class Printers lacked important product features that HP represented they had, and which HP failed to disclose they lacked.

158.    Plaintiffs and Class members bring this cause of action under Business and Professions Code section 17535 to enjoin the violations described herein and to require HP to issue appropriate corrective disclosures. HP's false advertising will continue to harm consumers unless and until it is enjoined. Plaintiffs and Class members therefore seek: (a) an order requiring HP to cease its false advertising; (b) full restitution of all monies HP derived from its false advertising; (c) interest at the highest rate allowable by law; and (d) an award of reasonable attorneys' fees and costs under applicable law, including Code of Civil Procedure section 1021.5.

### FOURTH CLAIM FOR RELIEF
**Violations of the Consumer Legal Remedies Act,**
**Cal. Civ. Code § 1750, *et seq*.**
**(On Behalf of the Class)**

159.    Plaintiffs incorporate the above allegations by reference.

160.    HP violated the Consumer Legal Remedies Act, including by:

a.    representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have (§ 1770(5));

b.    representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another (§ 1770(7));

c.    advertising goods or services with intent not to sell them as advertised (§ 1770(9));

d.      representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law (§ 1770(14)); and

e.      representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not (§ 1770(16)).

161.    The Class Printers are "goods" as defined by Civil Code § 1761(a).

162.    HP is a "person" as defined by Civil Code § 1761(c).

163.    Plaintiffs and Class members purchased Class Printers for personal, family, and household purposes, and hence are "consumers" as defined by Civil Code § 1761(d).

164.    These purchases by Plaintiffs and Class members are "transactions" as defined by Civil Code § 1761(e)

165.    HP made false and misleading representations regarding the features and functions of Class Printers, including by concealing, at the time of sale, the material fact that the printers would not allow the use of third-party ink cartridges and would only work with HP-branded ink cartridges.

166.    HP expressly represented to Plaintiffs and Class members, through written statements on the product box, inside the product box, and in its product Warranty, that the Class Printers would operate with certain models of replacement ink cartridges made or sold by companies other than HP. When purchasing the printer, Plaintiffs and Class members planned to use compatible third-party ink cartridges as replacements because HP-branded ink cartridges were much more expensive. When purchasing Class Printers, Plaintiffs and Class members reasonably understood and believed that they would be able to engage in the ordinary practice of replacing depleted ink cartridges with affordable, compatible replacement cartridges sold by competitors of HP. At the time of Plaintiffs' and Class members' printer purchases, almost every printer on the market allowed the use of third-party ink cartridges, and HP never disclosed that the Class Printers would not allow the use of such cartridges. In fact, after purchasing Class Printers, Plaintiffs and Class members initially could use third-party cartridges for replacement ink.

167.    Plaintiffs and Class members relied on HP's representations and omissions that they could purchase and use third-party replacement ink cartridges with their printers.

168.    The cost of the printer is an important consideration to consumers in the market for a printer. It is common knowledge that replacement ink cartridges account for a substantial portion of the

cost of an inkjet printer over its lifetime. It is also commonly known that brand-name ink cartridges are much more expensive than third-party cartridges. Reasonable consumers rely on this information when deciding which printer to purchase.

169.   In deliberately conveying to purchasers that they would be able to use third-party ink cartridges, and by suppressing and concealing the material fact that purchasers would not be able to use third-party cartridges while knowing that purchasers reasonably believed they could do so, HP made false and misleading representations regarding the features and functions included with the Class Printers, in violation of sections 1770(a)(5), (7), (9), (14), and (16) of the CLRA.

170.   Plaintiffs and Class members have suffered injury-in-fact from HP's CLRA violations. Had Plaintiffs and Class members known the material facts that HP concealed, they would not have purchased Class Printers or would have paid significantly less for them. Furthermore, to print documents on Class Printers after HP's firmware update, Plaintiffs and Class members have been required to purchase HP-branded ink cartridges priced around three to six times higher than the third-party ink cartridges they had been using—and to dispose of the third-party ink cartridges they already purchased before the end of those products' useful life.

171.   Plaintiffs and the Class accordingly are entitled to relief as provided for under the CLRA, including restitution, declaratory relief, and a permanent injunction. Plaintiffs also respectfully request reasonable attorneys' fees and costs under applicable law.

172.   Plaintiffs complied with Civil Code § 1782 by providing HP with presuit notice of HP's CLRA violations.

### FIFTH CLAIM FOR RELIEF
**Violations of the Texas Deceptive Trade Practices – Consumer Protection Act,**
**Tex. Bus. & Com. Code Ann. § 17.01, *et seq*.**
**(On behalf of the Texas Subclass)**

173.   Plaintiffs incorporate the above allegations by reference.

174.   San Miguel is a "consumer" as defined in Tex. Bus. & Com. Code Ann. § 17.45(4).

175.   HP is a "person" as defined in Tex. Bus. & Com. Code Ann. § 17.45(3).

176.   The Class Printers are "goods" as defined in Tex. Bus. & Com. Code Ann. § 17.45(1).

177.    HP engaged in false, misleading, and deceptive acts and practices in the conduct of trade and commerce, in violation of Tex. Bus. & Com. Code Ann. § 17.46. HP affirmatively represented that the Class Printers would function with compatible third-party ink cartridges, while failing to disclose that HP would disable printers operating with such cartridges. HP's failure to disclose such information was material: It had the purpose and effect of inducing reasonable consumers to transact when they otherwise would not have.

178.    HP's conduct was misleading, grossly unfair, and unconscionable in violation of Texas law. HP's deceptive trade practices involve the breach of a duty owed to the consuming public at large and harm the overall marketplace for the goods sold by HP.

179.    HP's deceptive trade practices took unfair advantage of and harmed San Miguel and Texas Subclass members. San Miguel and Texas Subclass members relied to their detriment on HP's deception, both when they purchased Class Printers and when they purchased replacement ink cartridges after HP's firmware update.

180.    As a direct and proximate result of HP's deceptive trade practices, San Miguel and Texas Subclass members have been damaged in an amount to be proven at trial.

181.    HP's deceptive trade practices were intentional. Therefore, under Tex. Bus. & Com. Code Ann. § 17.50(b)(1), San Miguel and Texas Subclass members are entitled to trebled damages.

182.    San Miguel and Texas Subclass members seek an injunction forbidding HP from committing similar violations, as provided for by Tex. Bus. & Com. Code Ann. § 17.50(b)(2), as well as court costs and reasonable and necessary attorneys' fees as provided for by Tex. Bus. & Com. Code Ann. § 17.50(d).

## SIXTH CLAIM FOR RELIEF
### Violations of the Washington Consumer Protection Act,
### Wash. Rev. Code Ann. § 19.86.010, *et seq*.
### (On Behalf of the Washington Subclass)

183.    Plaintiffs incorporate the above allegations by reference.

184.    Lawty and Washington Subclass members are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

185.    HP is engaged in "trade" and "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

186.    Washington law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or practices." Wash. Rev. Code § 19.86.020.

187.    HP's acts, omissions, and practices are unfair methods of competition and unfair acts or practices that violate Washington law for the reasons stated in the First Claim for Relief, *supra*.

188.    In disabling the Class Printers of Lawty and Washington Subclass members, HP acted unscrupulously in a manner that is substantially oppressive and injurious to consumers.

189.    HP's acts, omissions, and practices also violate Washington law because they are deceptive. HP made material misrepresentations and omissions that communicated to Lawty and Washington Subclass members that they would be able to engage in the reasonable and ordinary consumer practice of using compatible third-party ink cartridges in Class Printers.

190.    Lawty and Washington Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of HP's unfair and deceptive acts or practices. Had Lawty and Washington Subclass members known that HP would disable printers containing third-party ink cartridges, they would not have purchased Class Printers or would have paid significantly less for them. Among other injuries, Lawty and Washington Subclass members suffered diminished value of their Class Printers, as well as lost or diminished use.

191.    Under Wash. Rev. Code § 19.86.090, Lawty and the Washington Subclass seek an order enjoining HP's unfair and deceptive acts or practices, providing for appropriate monetary relief, including trebled damages, and awarding reasonable attorneys' fees and costs.

192.    In accordance with Wash. Rev. Code § 19.86.095, a copy of this Consolidated Complaint has been served on the Attorney General of Washington.

**SEVENTH CLAIM FOR RELIEF**
**Violations of the New Jersey Consumer Fraud Act,**
**New Jersey Statutes Ann. 56:8-1, *et seq.***
**(On Behalf of the New Jersey Subclass)**

193.    Plaintiffs incorporate the above allegations by reference.

194.    HP's acts, practices, misrepresentations, and omissions constitute unconscionable, unlawful, fraudulent, and deceptive commercial practices that violate New Jersey Statutes Ann. 56:8-2.

195.    In its advertising and sale of Class Printers, HP employed unconscionable commercial practices, deception, fraud, misrepresentations, and the knowing concealment, suppression, and omission of material facts, with the intent that others rely thereon.

196.    As a direct and proximate result of HP's conduct in violation of New Jersey law, Ware and New Jersey Subclass members have suffered ascertainable loss.

197.    Under New Jersey Statutes Ann. 56:8-19, Ware and New Jersey Subclass members are entitled to trebled damages, appropriate injunctive relief, and reasonable attorneys' fees.

**EIGHTH CLAIM FOR RELIEF**
**Violation of the Computer Fraud and Abuse Act,**
**18 U.S.C. § 1030, *et seq.***
**(On Behalf of the Disablement Class)**

198.    Plaintiffs incorporate the above allegations by reference.

199.    The Consumer Fraud and Abuse Act ("CFAA") establishes a private cause of action against a person who "knowingly accessed a computer without authorization or exceeding authorized access," and whose prohibited access results in damage or loss in excess of $5,000. 18 U.S.C. § 1030(g) (referencing § 1030(c)(4)(A)(i)(I)); *see also* § 1030(a).

200.    The CFAA establishes liability against whomever:

a.     "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer" (§ 1030(a)(5)(A));

b.     "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage" (§ 1030(a)(5)(B)); or

c.     "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss" (§ 1030(a)(5)(C)).

201.    The term "computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any

data storage facility or communications facility directly related to or operating in conjunction with such device[.]" 18 U.S.C. § 1030(e)(1).

202.    A "protected computer" is defined, in relevant part, as a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B).

203.    "[E]xceeds authorized access" means "access[ing] a computer with authorization and … us[ing] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

204.    "Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

205.    Damage means "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

206.    Class Printers are "computers" under the CFAA by virtue of their data processing and storage functions and their operation in conjunction with Plaintiffs' and Class members' laptop or desktop computers.

207.    Class Printers are "protected computers" under the CFAA because they are used in and affect interstate and foreign commerce and communication, including through contact and communication with remote servers and through personal and business usages that affect interstate and foreign commerce.

208.    HP knowingly and intentionally exceeded its authorized access to Plaintiffs' and Class members' printers. Plaintiffs and Class members did not consent to HP's invasive firmware update.

209.    By exceeding its authorized access, HP obtained and altered Class Printers' information and data. HP initiated printer-to-cartridge communications that, through the use of key codes, prevented the ink cartridge from continuing to work with the printer. These communications resulted from a single act in the form of HP's activation of its firmware update.

210.  By implementing its firmware update, HP knowingly caused the transmission of "a program, information, code, or command … to a protected computer" and, as a result of that conduct, intentionally caused damage in violation of 18 U.S.C. § 1030(a)(5)(A).

211.  By implementing its firmware update, HP intentionally accessed Class Printers without authorization, and as a result of that conduct, caused or recklessly caused damage or loss to those protected computers, in violation of 18 U.S.C. §§ 1030(a)(5)(B) and (a)(5)(C).

212.  HP's firmware implementation was a single act by which HP intentionally accessed Plaintiffs' and Class members' protected computers without authorization and by exceeding authorization. As a direct and proximate result of HP's CFAA violations, HP caused damages and loss to Plaintiffs and Class members during a one-year period that exceed $5,000 in value.

213.  HP's firmware implementation caused damage and loss to Plaintiffs and Class members, including by disabling Class Printers, eliminating or impairing Plaintiffs' and Class members' use of those printers, depriving Plaintiffs and Class members of the ability to use more affordable, non-HP replacement cartridges in their Class Printers, causing Plaintiffs and Class members to expend money, time, and labor to investigate and try to fix their disabled printers, and decreasing the value of the Class Printers.

214.  Based on HP's violation of the CFAA, Plaintiffs and Class members seek recovery of economic damages and all other relief provided for under 18 U.S.C. § 1030(g).

### NINTH CLAIM FOR RELIEF
**Violation of the California Computer Crime Law,**
**Cal. Penal Code § 502**
**(On Behalf of the California Subclass)**

215.  Plaintiffs incorporate the above allegations by reference.

216.  The California Computer Crime Law prohibits knowing and unauthorized access to computers, computer networks, and computer systems.

217.  Class Printers are "computers" and part of a "computer network" or "computer system" under this statute. While the statute does not define "computer," it defines "computer network" as "any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers

connected by telecommunication facilities." Penal Code § 502(b)(2). "Computer system" is defined, in relevant part, as a "device or collection of devices, including support devices … one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Penal Code § 502(b)(5).

218.    HP's firmware update is a "computer program or software" and "computer contaminant" under Penal Code §§ 502(b)(3) and (12).

219.    HP had "access" to Plaintiffs' and Class members' computers, computer systems, and computer networks under Penal Code § 502(b)(1) when it implemented its remote firmware update.

220.    HP implemented this firmware update knowingly and without permission from Plaintiffs and Class members.

221.    Through its firmware update, HP obtained and interfered with "data" from Class Printers under Penal Code § 502(b)(8).

222.    Through HP's knowing implementation of its firmware update without Plaintiffs' and Class members' permission, HP violated the California Computer Crime Law in at least the following respects:

a.    In violation of Penal Code §§ 502(c)(1)–(2), HP altered and made use of Class Printer data to devise and execute a scheme or artifice to defraud, deceive, or extort, and to wrongfully control or obtain money or property. Among other components of this scheme, HP's firmware update caused the Class Printers to display false error messages stating that existing ink cartridges in the printers were "damaged or missing" and should be replaced. HP deployed these false error messages to induce Plaintiffs and Class members to purchase new HP ink cartridges.

b.    In violation of Penal Code § 502(c)(3)–(4), HP used or caused to be used computer services, and added, altered, and damaged Class Printers' data, programs, or software.

c.    By implementing its firmware update and disabling Class Printers, HP caused the disruption and denial of computer services to authorized users, such as Plaintiffs and Class members, in violation of Penal Code § 502(c)(5).

d.      HP accessed or caused to be accessed Class Printers and introduced thereon a computer contaminate—its invasive firmware update—in violation of Penal Code §§ 502(c)(7)–(8).

223.    As an actual and proximate result of HP's conduct in violation of the California Computer Crime Law, Plaintiffs and Class members have been damaged in an amount to be determined at trial. Under Penal Code §§ 502(e)(1) and (2), Plaintiffs and Class members are entitled to compensatory damages, equitable relief, and reasonable attorneys' fees.

**TENTH CLAIM FOR RELIEF**
**Trespass to Chattels**
**(On Behalf of the Disablement Class)**

224.    Plaintiffs incorporate the above allegations by reference.

225.    Plaintiffs and Class members owned, possessed, and used, and had a right to possess and use, their Class Printers and their non-HP ink cartridges designed to be used in these printers.

226.    HP wrongfully and intentionally interfered with Plaintiffs' and Class members' ownership, possession, and use of their Class Printers and non-HP ink cartridges, by programming, distributing, and remotely activating a firmware update that disabled Class Printers containing non-HP ink cartridges and rendered those cartridges unusable.

227.    HP's wrongful and intentional interference with Plaintiffs' and Class members' ownership, possession, and use of their Class Printers and non-HP ink cartridges caused damage to Plaintiffs and Class members, including by preventing the Class Printers from operating, by impairing the condition of these printers, by reducing the value of these printers, and by depriving Plaintiffs and Class members of the use of these printers and of their non-HP ink cartridges for a substantial period of time. A reasonable person would be willing to pay significantly less for a Class Printer, and for non-HP ink cartridges compatible with it, if he or she knew that the printer contained or would be updated with firmware preventing the printer from working with non-HP ink cartridges.

228.    Plaintiff and Class members are entitled to recover the amount by which HP's firmware update harmed their possessory interests in Class Printers and non-HP ink cartridges.

**ELEVENTH CLAIM FOR RELIEF**
**Tortious Interference with Contractual Relations and/or Prospective Economic**
**Advantage**
**(On Behalf of the Class)**

229.    Plaintiffs incorporate the above allegations by reference.

230.    At the time HP programmed, distributed, and activated its disabling firmware update, Plaintiffs and Class members had entered into sales transactions with third-party suppliers of compatible printer ink cartridges. These transactions involved various contractual conditions of sale, such as express and implied warranties, and included an implied warranty that the third-party cartridges Plaintiffs and Class members purchased were merchantable and fit for their ordinary use of printing documents.

231.    Plaintiffs and Class members reasonably expected, and third-party suppliers of compatible printer ink cartridges expressly and impliedly promised, that the third-party cartridges Plaintiffs and Class members purchased would work in their intended manner and would not fail of their essential purpose when used in Class Printers.

232.    Compatible printer ink cartridges sold by third-party suppliers are substantially more affordable than HP-branded ink cartridges. Plaintiffs and Class member reasonably expected to be able to continue to purchase and use compatible third-party cartridges as replacements for as long as they owned Class Printers.

233.    HP was aware that Plaintiffs and Class members had purchased ink cartridges from third-party suppliers, that Plaintiffs and Class members relied on third-party ink cartridges, and that Plaintiffs and Class members reasonably expected to continue to be able to purchase and use such third-party cartridges for as long as they owned Class Printers.

234.    HP intentionally devised and executed a firmware update (a) to render Plaintiffs' and Class members' third-party ink cartridges unusable and unfit for their ordinary and intended purpose of printing documents, and (b) to prevent Plaintiffs and Class members from continuing to purchase third-party ink cartridges.

235.    At the time HP devised and executed its firmware update, HP knew that the update was substantially certain (a) to render Plaintiffs' and Class members' third-party ink cartridges unusable and

1  unfit for their ordinary and intended purpose of printing documents, and (b) to prevent Plaintiffs and

2  Class members from continuing to purchase third-party ink cartridges.

3          236.    HP's interference with the contractual conditions of sale between Plaintiffs and Class

4  members, on one hand, and third-party ink cartridge suppliers, on the other hand, was intentional and

5  wrongful.

6          237.    HP's interference with Plaintiffs and Class members' reasonable expectation that they

7  could continue to purchase and use compatible third-party ink cartridges priced well below HP-branded

8  cartridges, was intentional and wrongful.

9          238.    Plaintiffs and Class members sustained harm as a direct and proximate result of HP's

10 tortious interference with contractual relations and/or prospective economic advantage. Plaintiffs and

11 Class members were deprived of, among other things, third-party ink cartridges that worked as intended

12 and the ability to purchase and use such cartridges in the future. Plaintiffs and Class members

13 accordingly seek damages in an amount to be proven at trial.

14                                    **PRAYER FOR RELIEF**

15          WHEREFORE, Plaintiffs, on behalf of themselves and the Class and Subclasses defined above,

16 respectfully request that this Court:

17          A.     Certify this case as a class action under Federal Rule of Civil Procedure 23, appoint

18 Plaintiffs as Class and Subclass representatives, and appoint the undersigned counsel as Class counsel;

19          B.     Enter injunctive and declaratory relief as appropriate under applicable law;

20          C.     Order restitution or actual damages to Plaintiffs and Class members;

21          D.     Award Plaintiffs and Class members trebled damages along with pre- and post-judgment

22 interest, as prescribed by law;

23          E.     Award punitive damages, as permitted by law, in an amount to be determined by the jury

24 or the Court;

25          F.     Order HP to provide notice to the Class of this action and of the remedies entered by the

26 Court;

27          G.     Award reasonable attorneys' fees and costs as permitted by law; and

28          H.     Enter such other and further relief as may be just and proper.

CONSOLIDATED AMENDED COMPLAINT
Case No. 5:16-cv-05820-EJD-SVK

1

## DEMAND FOR JURY TRIAL

2          Plaintiffs hereby demand a jury trial on all issues so triable.

3

4   Dated:  February 15, 2018                    By:      /s/ *Jordan Elias*

5                                               Daniel C. Girard (SBN 114826)
                                                Jordan Elias (SBN 228731)
6                                               Elizabeth A. Kramer (SBN 293129)
                                                **GIRARD GIBBS LLP**
7                                               601 California Street, Suite 1400
                                                San Francisco, California 94108
8                                               Telephone: (415) 981-4800
                                                *dcg@girardgibbs.com*
9                                               *je@girardgibbs.com*
                                                *eak@girardgibbs.com*
10

11                                              Todd M. Friedman (State Bar No. 216752)
12                                              Adrian R. Bacon (State Bar No. 280332)
                                                **LAW OFFICES OF TODD M. FRIEDMAN,**
13                                              **P.C.**
                                                21550 Oxnard St., Suite 780
14                                              Woodland Hills, California 91367
                                                Telephone: (877) 206-4741
15                                              Facsimile:  (866) 633-0228
                                                *tfriedman@toddflaw.com*
16                                              *abacon@toddflaw.com*
17

18                                              Joseph R. Saveri (SBN 130064)
                                                Nicomedes S. Herrera (SBN 275332)
19                                              Kyla J. Gibboney (SBN 301441)
                                                **JOSEPH SAVERI LAW FIRM, INC.**
20                                              555 Montgomery Street, Suite 1210
                                                San Francisco, California 94111
21                                              Telephone:  (415) 500-6800
                                                Facsimile:    (415) 395-9940
22                                              *jsaveri@saverilawfirm.com*
                                                *nherrera@saverilawfirm.com*
23                                              *kgibboney@saverilawfirm.com*
24

25                                              Daniel R. Karon
                                                **KARON LLC**
26                                              700 W. St. Clair Avenue, Ste. 200
                                                Cleveland, Ohio 44113
27                                              Telephone: (216) 622-1851
                                                Facsimile:  (216) 241-8175
28                                              *dkaron@karonllc.com*

CONSOLIDATED AMENDED COMPLAINT
Case No. 5:16-cv-05820-EJD-SVK

Taylor Bartlett (pro hac vice)
**HENINGER GARRISON DAVIS, LLC**
2224 1st Avenue North
Birmingham, Alabama 35203
Telephone: (205) 326-3336
Facsimile:  (205) 380-8085
*taylor@hgdlawfirm.com*

*Attorneys for Plaintiffs*

## ATTESTATION

I, Jordan Elias, am the ECF user whose identification and password are being used to file this Consolidated Amended Complaint. I attest under penalty of perjury that concurrence in this filing has been obtained from all counsel listed above.

DATED:  February 15, 2018                /s/ *Jordan Elias*
                                                                        Jordan Elias