UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RICHARD SAN MIGUEL, et al.,<br><br>        Plaintiffs,<br><br>   v.<br><br>HP INC.,<br><br>        Defendant. | Case No.  5:16-cv-05820-EJD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**<br><br>Re: Dkt. No. 66 |

## I.  INTRODUCTION

This putative nation-wide class action suit arises out of Defendant HP Inc.'s ("HP") allegedly unlawful implementation of a firmware update that incapacitated thousands of HP printers and all-in-one devices (collectively "HP printers") and prevented the use of certain third-party ink cartridges in those printers.  Plaintiffs Richard San Miguel, DeLores Lawty, Richard Faust, Christopher Ware and James Andrew ("Plaintiffs")[1] allege that HP used the firmware in an attempt to gain an advantage over its competitors and to extract higher profits from the ink cartridge aftermarket.

HP moves to dismiss the Consolidated Amended Complaint ("Complaint")[2] pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), asserting, among other things, that HP has no legal obligation to make its printers compatible with any and all third-party ink cartridges.  Based

---

[1] The parties have stipulated to dismiss the claims of Plaintiff Robert Doty.  See Dkt. 89.
[2] After the briefing on the motion to dismiss was completed, the parties stipulated to the filing of the Consolidated Amended Complaint and agreed that HP's motion to dismiss would apply to the Consolidated Amended Complaint without the need for further response or briefing.

upon all pleadings filed to date and the comments of counsel at the hearing, HP's motion to dismiss is granted in part and denied in part.

## II.  BACKGROUND[3]

Plaintiffs each purchased an HP printer and bought third-party ink cartridges when the original HP ink cartridges that came with their printers ran out of ink.  Plaintiff Richard San Miguel ("Miguel") purchased an HP printer in December 2015.  Miguel refilled his printer with ink cartridges manufactured by an HP competitor.  These ink cartridges functioned up until September 12, 2016.  On September 13, 2016, Miguel's HP printer unexpectedly failed and the screen displayed a message directing him to remove "damaged" ink cartridges and replace them with new cartridges.  Miguel alleges that HP caused this failure by disabling his printer.  Miguel clicked on the link that was displayed on his screen, which led him to an HP website selling HP ink cartridges.  The screen on his printer also indicated that his replacement color ink cartridges were empty, but they weren't.  Miguel alleges that "[h]is printer's inoperability caused him to expend time and money."  Complaint at ¶17.  He further alleges that when he bought his HP printer, he relied on the ability to use third-party ink cartridges.  If he had known that HP would prevent him from using third-party ink cartridges, he would not have bought an HP printer or he would have paid significantly less for it.

Plaintiff DeLores Lawty ("Lawty") purchased an HP printer in February 2015 and used the HP ink cartridges that came with the printer until approximately June 2016.  Lawty replaced them with non-HP ink cartridges purchased online and printed documents using those cartridges.  On September 15, 2016, Lawty's printer wouldn't work and the screen on her printer said there was an error with her ink cartridges.  Lawty checked her cartridges and they were still full of ink.  Lawty replaced the non-HP cartridges with a new set of non-HP cartridges, but the printer still would not work.  Lawty tried to troubleshoot the problem with HP, but she was unable to get her printer to work.  Lawty alleges that HP caused her printer to fail by disabling it.  She ultimately

---

[3] The Background is a summary of the allegations in the Complaint.

bought a replacement printer from HP. Lawty never allowed HP to push through its firmware update. If Lawty had known that HP could or would disable her printer remotely, she would not have bought an HP printer or she would have paid significantly less for it.

Plaintiff Richard Faust ("Faust") purchased an HP printer in 2014. When the ink cartridges that came with the printer ran out of ink, he purchased and installed ink cartridges made by an HP competitor. He used the non-HP cartridges to print hundreds of pages of documents. On or about September 16, 2016, Faust's printer wouldn't work. The error message on the printer screen said that the ink cartridges were missing or damaged. Faust alleges that HP caused his printer to fail by disabling it. When investigating his printer problem, Faust learned of an optional firmware update that HP had released to fix the problem. Faust downloaded the update, but still couldn't print documents. Faust contacted HP's technical support, but the problem was not resolved. Faust purchased a Canon printer to replace his HP printer. If Faust had known HP would disable his printer if he installed non-HP ink cartridges, he would not have bought an HP printer or would have paid significantly less for it.

Christopher Ware ("Ware") experienced similar problems with his HP printer. The error message on Ware's HP printer screen said: "There is a problem with the printer or ink system. Turn printer off, then on. If problem persists, contact HP." Complaint at ¶39. Ware tried twice to download the "patch" offered by HP to regain operability with certain non-HP printer cartridges, but was unable to do so. Id. at ¶41. Ware installed HP printer cartridges and was again able to use his HP printer.

When James Andrews ("Andrews") was shopping for a printer, he "learned that the HP Officejet 4500 printer used 901 and 61 ink cartridges; HP represented on the product box that the printer used these models." Id. at ¶44. Andrew alleges that "[t]he 901 and 61 labels are generic part numbers for cartridges that are compatible, because of their size and functionality, with his printer." Id. Andrew alleges that HP never disclosed to him that he would not be able to print documents using third-party ink cartridges. Id. Andrews planned to use third-party ink cartridges

because he knew that HP ink cartridges were much more expensive. Andrews purchased and used "901 and 61 ink cartridges from third-party sellers." Id. at ¶47. However, in November 2016 his printer began rejecting the third-party ink cartridges and refills. When Andrews inserted a new third-party ink cartridge, the printer showed an error code and would not print. Andrews "later learned that HP, th[r]ough his computer, had forced a firmware modification that [] froze his printer and prevented him from using third-party ink cartridges." Id. at ¶49. Andrews never permitted HP to modify his printer's firmware. Andrews "had to buy new HP-branded ink cartridges at a considerably higher price than he paid for the non-HP cartridges" to get his printer to work again. Id. at ¶51. Andrews alleges that he relied to his detriment on "HP's material representations and omissions that he would be able to buy third-party ink cartridges and use them in his printer." Id. at ¶52. Andrews would not have bought the HP printer if he had known that "HP's representations were false or that HP would forcibly control and modify his printer." Id. at ¶53.

Plaintiffs collectively allege that HP's firmware update changed the communication protocol between HP printers and microchips located in both HP-branded ink cartridges and third-party cartridges so that certain varieties of third-party inkjet cartridge microchips, including those manufactured and distributed by Apex Microelectronics and Static Control Components, could no longer communicate with the HP printer. Id. at ¶¶80-82. The firmware blocked ink cartridges containing these chips from functioning in an HP printer. Id. Plaintiffs allege that this type of conduct, which HP refers to as "dynamic security," "has disrupted the marketplace in the inkjet cartridge and refill market, by systematically disabling technology lawfully reengineered by third-party makers who sell their products in the same market as HP." Id. at ¶¶82-83. Plaintiffs allege that the firmware updates have rendered third-party products obsolete with the click of a button, harmed competition, and caused consumers to pay more for HP products. Id. at ¶83.

Plaintiffs allege that HP's conduct in disabling printers prompted a flurry of complaints and criticisms from consumers, advocacy groups, and others. Id. at ¶88. In response, on

September 28, 2016, Jon Flaxman, the Chief Operating Officer of HP, issued a public statement, which said: "We should have done a better job of communicating about the authentication procedure to customers, and we apologize. . . . Again, to our loyal customers who were affected, we apologize." Id. at ¶89. On October 12, 2016, HP notified customers "regarding an optional firmware update that customers could download." Id. at ¶91. Plaintiffs allege, however, that HP's notice of this remedial update did not fully and clearly disclose which printers and ink cartridges its firmware update impaired. Id. at ¶92. Plaintiffs also allege that HP has failed to adequately make Plaintiffs and class members aware that an update purporting to reverse the printer disablement is available. Id. at ¶93. "Unlike the printer-disabling firmware update that HP installed remotely, its remedial update is not automatic. It is available only as an optional download." Id. at ¶94. Plaintiffs allege that ordinary consumers "had no way of learning about HP's remedial update because HP buried its notice of this update on its website, with very limited notice to consumers." Id. at ¶97. Moreover, Plaintiffs allege that the remedial update is inadequate to restore printer functionality. Id. at ¶99.

HP's warranty for the printers identified in the complaint ("Class Printers")[4] provides: "The use of a non-HP or refilled cartridge does not affect either the HP Limited Warranty to the end-user customer or any HP support contract with the end-user customer for the printer." Id. at ¶102. Plaintiffs allege that this language "reinforced consumers' ordinary custom, expectation and practice of printing documents with Class Printers using compatible non-HP ink cartridges." Id.

Based upon the foregoing allegations, Plaintiffs seek to represent the following Class and Subclasses (unless otherwise specified, the "Class"): all persons in California who own a Class Printer (the "Injunctive Relief Class"); all persons in the United States who purchased a Class Printer and experienced a print failure while using a non-HP aftermarket cartridge during the period between March 1, 2015 and December 31, 2017 (the "Disablement Class"); all persons in Texas who purchased or owned one or more Class Printers (the "Texas Subclass"); all persons in

---

[4] See Complaint at ¶63 for complete list of Class Printers.

Washington who purchased or owned one or more Class Printers (the "Washington Subclass"); and all persons in New Jersey who purchased or owned one or more Class Printers (the "New Jersey Subclass"). Id. at ¶105. Plaintiffs assert claims for (1) unfair and unlawful business practices in violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq*., on behalf of the Injunctive Relief Class; (2) fraudulent business practices in violation of the UCL on behalf of the Class; (3) violation of the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §17500, *et seq*., on behalf of the Class; (4) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, *et seq*., on behalf of the Class; (5) violations of the Texas Deceptive Trade Practices – Consumer Protection Act, Tex. Bus. & Com. Code Ann. §17.01, *et seq*., on behalf of the Texas Subclass; (6) violations of the Washington Consumer Protection Act, Wash. Rev. Code Ann. §19.86.010 *et seq*., on behalf of the Washington Subclass; (7) violations of the New Jersey Consumer Fraud Act, New Jersey Statutes Ann. 56:8-1, *et seq*., on behalf of the New Jersey Subclass; (8) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §1030, *et seq*., on behalf of the Disablement Class; (9) violation of the California Computer Crime Law, Cal. Penal Code §502, on behalf of the California Subclass; (10) trespass to chattels; and (11) tortious interference with contractual relations and/or prospective economic advantage on behalf of the Class.

### III. STANDARDS

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of claims alleged in the complaint. Fed.R.Civ.P. 12(b)(6); Parks School of Business, Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When deciding whether to grant a motion to dismiss, the court must construe the alleged facts in the light most favorable to the plaintiff. See Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am., 768 F.3d 938, 945 (9th Cir. 2014) (providing the court must "draw all reasonable inferences in favor of the

nonmoving party" for a Rule 12(b)(6) motion). However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678. Dismissal "is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).

Consumer-protection claims that sound in fraud are subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b). Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1102 (9th Cir. 2003); see also Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009); In re Apple and AT&T iPad Unlimited Data Plan Litigation, 802 F.Supp.2d, 1070, 1075 (N.D. Cal. 2011) (Rule 9(b) applies to claims under the UCL and FAL). Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud. . . ." Fed.R.Civ.P. 9(b). The circumstances constituting the fraud must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). Therefore, a party alleging fraud must set forth "the who, what, when, where, and how" of the misconduct. Vess, 317 F.3d at 1106 (quoting Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)).

## IV. DISCUSSION

HP moves to dismiss all of Plaintiffs' claims, asserting that HP is not under any legal duty to make its printers compatible with third-party ink cartridges. HP reasons that all of Plaintiffs' claims start from the underlying and deficient premise that HP had some duty to make its printers compatible with third-party ink cartridges, even those using cloned and infringing security chips affected by the authentication procedure in HP's firmware. HP asserts that it was under no such legal obligation, did not make any such representations and did nothing unlawful.

### A. Computer Intrusion Claims

HP contends that all claims premised on computer intrusion should be dismissed with prejudice because Plaintiffs do not allege and cannot allege that HP accessed any computer

without authorization. In response, Plaintiffs contend that "[t]o the extent HP had any authorized access to Plaintiffs' printers, HP exceeded that access . . . when it froze them." Plaintiffs' Opposition at 21:22-24.

### 1. Violation of the CFAA (Claim 8)

The CFAA is a federal criminal statute that also authorizes civil actions for any person who suffers damage or loss by reason of a violation of the statute. 18 U.S.C. §1030(g). "The CFAA prohibits a number of different computer crimes, the majority of which involve accessing computers without authorization or in excess of authorization, and then taking specified forbidden actions, ranging from obtaining information to damaging a computer or computer data." LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1135 (9th Cir. 2009) (citing 18 U.S.C. 1030(a)(1)-(7) (2004)).

Plaintiffs allege that HP violated §1030(a)(5)(A) through (C), which create liability for whoever:

> (5)(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;
>
> (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or
>
> (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

18 U.S.C. §10301(a)(5)(A)-(C). The term "without authorization" has been interpreted to mean "when the person has not received permission to use the computer for any purpose (such as when a hacker accesses someone's computer without any permission)" or when the [computer owner] has rescinded permission to access the computer and the defendant uses the computer anyway." Brekka, 581 F.3d at 1135; see Facebook, Inc. v. Power Ventures, Inc., 844 F.3d 1058, 1066 (9th Cir. 2016) (same).

Subsections (B) and (C) are inapplicable in light of Plaintiffs' admission in the Complaint that HP had "authorized access" to Plaintiffs' printers.  See Complaint at ¶¶208 (HP "exceeded its authorized access"); see also id. at ¶62 (HP can communicate with HP printers after it sells them by updating their firmware), and 82-83 (describing HP firmware updates).  Nevertheless, Plaintiffs contend that they may proceed with their claim based upon allegations that HP "exceeded" its authorized access.  Plaintiffs' Opposition at 21:22-25.  Plaintiffs allege that HP neither sought nor obtained Plaintiffs' consent to access their printers to install the firmware update; HP did not notify Plaintiffs that it planned to "push" this update; Plaintiffs reasonably expected that HP was not entitled to disable their working printers; HP purposely concealed that it had accessed the printers to install disabling firmware; HP displayed false error messages; the firmware update was executed not for cyber-security reasons, but to suppress competition and limit consumer choice in the aftermarket for ink; and the firmware update intercepted and altered the communication protocol between the printers and their ink cartridges to cause these products to fail.  Id. at 21:10-20.

Subsections (B) and (C) cannot reasonably be expanded in the manner proposed by Plaintiffs to encompass HP's alleged conduct that "exceeded authorized access."  Plaintiffs' proposed expansion would be not only contrary to the plain language of subsections (B) and (C), but also inconsistent with other provisions of the CFAA that expressly provide for liability when a defendant "accesses a computer without authorization *or* exceeds authorized access."  18 U.S.C. §1030(a)(2); see also (a)(1), (4), 7(B).[5]  Furthermore, Plaintiffs' proposed expansion is inconsistent with the Congressional intent behind the CFAA.  "Congress enacted the CFAA in 1984 primarily to address the growing problem of computer hacking, recognizing that '[i]n intentionally trespassing into someone else's computer files, the offender obtains at the very least information as to how to break into that computer system.'"  U.S. v. Nosal, 676 F.3d 854, 858 (9th

---

[5] The phrase "exceeds authorized access" is statutorily defined to mean "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. §1030(e)(6).

1  Cir. 2012) (en banc).  The CFAA should be interpreted in a manner that "maintains the CFAA's

2  focus on hacking rather than turning it into a sweeping Internet-policing mandate."  Id.  Because

3  Plaintiffs have not alleged facts to show HP accessed their printer "without authorization," the

4  CFAA claim is dismissed to the extent it is based on subsections (B) and (C).

5      To the extent Plaintiffs' CFAA claim is based upon subsection (A), the claim is cognizable

6  because subsection (A) does not require accessing a computer "without authorization."  Instead,

7  subsection (A) provides liability for "knowingly caus[ing] the transmission of a program,

8  information, code or command, and as a result of such conduct, intentionally caus[ing] damage

9  without authorization, to a protected computer."  18 U.S.C. §1030(a)(5)(A).  Plaintiffs allege that

10  HP knowingly transmitted the firmware update and intentionally caused damage.  Plaintiffs further

11  allege that they did not consent to installation of disabling firmware.  At the pleading stage, these

12  allegations are sufficient.  See In re Apple & AT & TM Antitrust Litigation, 596 F.Supp.2d 1288

13  (N.D. Cal. 2008) (plaintiffs alleged they authorized software update, not that they authorized

14  damages to their iPhones).

15          **2.  California Penal Code §502 (Claim 9)**

16      The California Penal Code §502 imposes liability on a person who commits certain "acts"

17  that constitute a public offense.  Penal Code §502(c).  Plaintiffs allege that HP violated §502(c)(1)

18  through (c)(5), (c)(7) and (c)(8), which impose liability on any person who:

19  (1) Knowingly accesses and without permission alters, damages,
20  deletes, destroys, or otherwise uses any data, computer, computer
    system, or computer network in order to either (A) devise or execute
21  any scheme or artifice to defraud, deceive, or extort, or (B)
    wrongfully control or obtain money, property, or data.

22  (2) Knowingly accesses and without permission takes, copies, or
    makes use of any data from a computer, computer system, or
23  computer network, or takes or copies any supporting documentation,
    whether existing or residing internal or external to a computer,
24  computer system, or computer network.

25  (3) Knowingly and without permission uses or causes to be used
    computer services.
26

27  (4) Knowingly accesses and without permission adds, alters,

Case No.: 5:16-cv-05820-EJD
28  ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
    DISMISS CONSOLIDATED AMENDED COMPLAINT

damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

\* \* \*

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

(8) Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

Cal. Penal Code 502(c)(1)-(5), (7)-(8).

HP contends that the §502 claim must be dismissed in its entirety because HP had authorized access to Plaintiffs' printers and because Plaintiffs plead only threadbare legal conclusions unsupported by facts. Plaintiffs counter that §502 does not require unauthorized access, only knowing access.

The Ninth Circuit has held that §502 is "different" from the CFAA. United States v. Christensen, 801 F.3d 970, 994 (2015) (emphasis in original). "In contrast to the CFAA, the California statute does not require *unauthorized* access. It merely requires *knowing* access." Id. Despite this seemingly clear holding, HP relies upon language in the Ninth Circuit's Facebook decision, supra, that appears to create a contradiction: "because [defendant] had implied authorization to access Facebook's computers, it did not . . . violate the statute." Seizing upon this statement, HP argues that it had authorization to access Plaintiffs' computers and therefore Plaintiffs' Section 502 claim is similarly not cognizable, without consideration of the specific offenses that HP allegedly committed. A review of the underlying facts in Facebook is required to provide context for the Ninth Circuit's statement.

In Facebook, the defendant Power Ventures ("Power") caused a message to be transmitted to its user's friends within the Facebook system. In analyzing the CFAA claim predicated on

§1030(a)(2)(C)[6], the Ninth Circuit determined that Power's users arguably gave Power permission to use Facebook's computers to disseminate messages, and that Power reasonably could have thought that consent from Facebook users was permission for Power to access Facebook's computers. The Ninth Circuit held in pertinent part that "[b]ecause Power had at least arguable permission to access Facebook's computers, [Power] did not initially access Facebook's computers 'without authorization' within the meaning of the CFAA." Facebook, 844 F.3d at 1067. After Power's initial access to Facebook's computers, Facebook issued a written cease and desist letter to Power. The Ninth Circuit held that after receiving the case and desist letter, Power's access of Facebook's computers was "without authorization" in violation of the CFAA. Turning to the §502(c)(2) claim, the Ninth Circuit acknowledged that §502 was different from the CFAA insofar as §502 did not require unauthorized access. Facebook, 844 F.3d at 1069 (quoting Christensen, supra). The Ninth Circuit held that Power did not violate §502 when it initially accessed Facebook's computers, reasoning as follows:

> But despite the differences in wording, the analysis of both statutes is similar in the present case. Because Power had implied authorization to access Facebook's computers, it did not, at first, violate the statute. But when Facebook sent the cease and desist letter, Power, as it conceded, knew that it no longer had permission to access Facebook's computers at all. Power, therefore, knowingly accessed and without permission took, copied, and made use of Facebook's data. Accordingly, we affirm in part the district court's holding that Power violated section 502.

Id. Placed in context, it is implicit in the Ninth Circuit's determination above that Power's "implied authorization" meant Power had "permission" to take, copy and make use of Facebook's data, and that therefore, Power "did not, at first, violate the statute." Id. The Ninth Circuit's determination cannot reasonably be construed, as HP suggests, to preclude any and all liability under §502 whenever there is authorization to access. This is so because the Ninth Circuit clearly stated that §502 "does not require *unauthorized* access. It merely requires *knowing* access." Id.

---

[6] This subsection creates liability for whoever "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." 18 U.S.C. §1030(a)(2)(C).

Case No.: 5:16-cv-05820-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT

United States District Court
Northern District of California

(emphasis in original). Rather, whether there is liability under §502 requires an analysis of the specific "acts" that are alleged to constitute an offense and whether there was "permission" to engage in those acts.

As for the substance of the various alleged §502 violations, Plaintiffs' allegations are sufficient to state a plausible claim for violation of subsection (c)(1) based, at a minimum, upon the allegedly false error message stating that existing ink cartridges in the printers were "damaged or missing" and should be replaced. Plaintiffs also state a viable claim for violations of subsections (c)(4) and (c)(5) based upon the alleged alteration and disruption caused by the firmware update to a "computer network," which is statutorily defined to include, among other things, "printers connected by telecommunication facilities." Penal Code §502(b)(2). HP contends that §502 is meant to impose liability for hacking, not firmware, and urges the Court to interpret the statute narrowly. See Leocal v. Ashcroft, 543 U.S. 1, 11 n.8 (2004) (discussing rule of lenity to resolve ambiguity in criminal statute in petitioner's favor); see also People v. Davis, 29 Cal.3d 814, 828 (1981) (setting forth principles of statutory interpretation). Although HP's contention has considerable merit, the language of subsections (c)(1), (c)(4) and (c)(5) does not necessarily foreclose Plaintiffs' theories of liability, at least at the pleading stage.

Plaintiffs do not allege sufficient facts to state a claim for violations of subsections (c)(2)-(3) and (8). The alleged violation of subsection (c)(7) also fails because Plaintiffs acknowledge that HP had permission to access their printers. The §502 claim is accordingly dismissed to the extent it is based upon subsections (c)(2), (c)(3), (c)(7) and (c)(8).

### 3. Trespass to Chattels (Claim 10)

"The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another." Miller v. Nat'l Broad. Co., 187 Cal.App.3d 1463, 1480 (1986) (citations omitted). The California Supreme Court has held that the principles underlying the tort apply to allegations of digital trespass. Intel Corp. v. Hamidi, 30 Cal.4th 1342 (2003). "[T]o prevail on a claim for trespass based on accessing a computer system, the plaintiff must establish: (1) defendant

1    intentionally and without authorization interfered with plaintiff's possessory interest in the

2    computer system; and (2) defendant's unauthorized use proximately resulted in damage to

3    plaintiff." eBay, Inc. v. Bidder's Edge, Inc., 100 F.Supp.2d 1058, 1069-70 (N.D. Cal. 2000).

4         Plaintiffs' trespass allegations mirror those relating to its CFAA claim.  Plaintiffs allege

5    that HP exceeded its authorized access to Plaintiffs' printers when it activated a firmware update

6    that disabled their printers.  Complaint at ¶208.  The firmware allegedly disabled Plaintiffs'

7    printers and rendered their non-HP ink cartridges unusable.  Id. at ¶226.  Plaintiffs further allege

8    that HP's conduct caused damage by preventing the class printers from operating, impairing the

9    condition of the printers, reducing the value of the printers, and depriving Plaintiffs of the use of

10   the printers and of their non-HP ink cartridges for a substantial period of time.  Id. at ¶227.  These

11   allegations are sufficient to state a claim for digital trespass incident to a software download.  See

12   In re Apple & AT & MT Antitrust Litigation, 596 F.Supp.2d at 1307 (consent limited to

13   installation of software update did not foreclose trespass claim); see also eBay, 100 F.Supp.2d at

14   1070 (trespass claim cognizable because even if defendant's web crawlers were authorized to use

15   eBay's system, the web crawlers exceeded the scope of any such consent when they began acting

16   like robots by making repeated queries).

17        **B.    California Consumer Protection Claims**

18        HP contends that each of Plaintiffs' California consumer protection claims fails to state a

19   plausible claim and should be dismissed.

20              **1. Claims 1-4:  FAL, CLRA and UCL "fraudulent" prong Claims**

21        Plaintiffs allege that HP made misrepresentations and omissions about the compatibility of

22   third-party ink cartridges with their printers in violation of the FAL, the CLRA, and the

23   "fraudulent" prong of the UCL.  HP contends the claims should be dismissed as to San Miguel,

24   Lawty, Faust and Ware because they do not allege that they were affirmatively misled.  HP also

25   contends that the claims should be dismissed as to Andrews for failure to plead fraud with

26   particularity.

27

### a. Allegedly Fraudulent Misrepresentations On Printer Box

Plaintiffs San Miguel, Lawty, Faust and Ware do not identify any HP representation that they saw or relied upon when purchasing their printers. Their Claims 1 through 4 are accordingly dismissed to the extent they are predicated upon alleged misrepresentations on HP's printer box.

Plaintiff Andrews alleges that "HP represented on the product box that the printer used [901 and 61 ink cartridges]" and that the "901 and 61 labels are generic part numbers for cartridges that are compatible . . . with his printer." Complaint at ¶44. Andrews' allegations are insufficient to comply with Rule 9(b), Fed.R.Civ.P. Andrews does not identify any statement on the box that would lead a reasonable consumer to believe the numbers on the product box are generic part numbers. Moreover, Andrews acknowledges that the printer box states "HP Original Ink." Plaintiffs' Opposition at 19:16-20. Andrews nevertheless contends that a reasonable consumer would be misled because "HP Original Ink" appears in much smaller type than the model numbers and a reasonable consumer would interpret "HP Original Ink" as promoting HP ink over generic ink. Id. at 19:17-20. It defies common sense to claim that the statement "HP Original Ink" misrepresents compatibility with non-HP ink simply because the statement appears in smaller type. Although it is theoretically possible that a consumer might construe the statement as Andrews contends, "[a] representation does not become 'false and deceptive' merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed." Davis v. HSBC Bank Nev., N.A., 691 F.3d 1152, 1162 (9th Cir. 2012) (quoting Lavie v. Procter & Gamble Co., 129 Cal.Rptr.2d 486, 494 (2003); Werbel ex rel. v. Pepsico, Inc., No. 09-4456 SBA, 2010 WL 2673860, at *3 (N.D. Cal. July 2, 2010). Andrews' Claims 1through 4 are dismissed to the extent they are predicated upon alleged misrepresentations on the printer box.

### b. Allegedly Fraudulent Misrepresentations inside HP Printer Box

Plaintiffs next contend that "HP's deception continued with statements inside the box. The printer card urged people to 'Say it best with HP ink.' [citation omitted] and the warranty booklet

provided that a printer would remain under warranty even if fitted with 'a non-HP or refilled cartridge.'" Plaintiffs' Opposition at 19:20-23. Plaintiffs contend that "it defies logic that HP would make these statements and advertise its own ink, unless the consumer was free to use competing ink." Id. at 19:23-24. Plaintiffs acknowledge, however, that they were not "exposed" to the card and warranty until after they bought their printers. They do not allege that they read or relied upon these statements when making either their printer purchases or ink cartridge purchases. Therefore the statements inside HP's printer box do not provide a basis for Plaintiffs' fraudulent misrepresentation claims.

### c. Allegedly Fraudulent Misrepresentations in "Error Messages"

Plaintiffs also allege (in their UCL claim) that the "error messages" displayed on their printers were false and misleading. Specifically, Plaintiffs allege that the "error messages" misrepresented that the printer failure resulted from missing or damaged ink or from an undefined printer problem. HP contends the "error messages" cannot support a UCL fraud claim because they did not cause an independent economic injury. Plaintiffs' Complaint, however, includes allegations that they were induced to spend money on new replacement cartridges or a new printer. See Complaint at ¶¶21, 42, 51. At the pleading stage, Plaintiffs' allegations of economic injury are sufficient.

### d. Allegedly Fraudulent Omissions

Plaintiffs assert violations of the UCL, FAL and CLRA based upon an alleged failure to disclose theory. Plaintiffs allege that HP concealed its intent to preclude the use of compatible third-party ink cartridges and to disable Class Printers containing them. HP contends that the failure to disclose theory is not legally viable because in the absence of an affirmative misrepresentation, only omissions regarding a physical injury or safety concerns are actionable. Plaintiffs argue that HP's position is based on a misreading of California law. Plaintiffs' Opposition at 17:8. Relying on Rutledge v. Hewlett-Packard Co., 238 Cal.App.4th 1164 (2015), Plaintiffs contend that they are not required to allege that HP's concealment related to product

safety for it to be material and actionable under California law. Plaintiffs' Opposition at 18:3-4.

A plaintiff may base a UCL claim on an alleged omission, "[but] to be actionable the omission must be contrary to a representation actually made by the defendant, or an omission of a fact that the defendant was obliged to disclose." Sud v. Costco Wholesale Corp., 229 F.Supp.3d 1075, 1085 (N.D. Cal. 2017) (quoting Daugherty v. Am. Honda Motor Co., 144 Cal.App.4th 824, 835 (2006)); see also Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1141 (9th Cir. 2012) (fraudulent omission concerning latent defect not actionable unless the omission is contrary to a representation actually made or an omission of fact the defendant was obliged to disclose); McCoy v. Nestle USA, Inc., 173 F.Supp.3d 954, 965 (N.D. Cal. 2016) ("[T]o be actionable the omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose.")

As stated previously, Plaintiffs allege that the "error messages" misrepresented that the printer failure resulted from missing or damaged ink or from an undefined printer problem. The alleged omission, that HP intentionally used a firmware update to disable printers that were using non-HP ink cartridges, is arguably contrary to the explanations for the printer failure stated in the "error messages." At the pleadings stage, Plaintiffs' allegations are sufficient to state fraud by omission under the FAL, CLRA and the UCL.

### 2. "Unfair" Business Practices Under the UCL (Claim 1)

The UCL does not define the term "unfair" and the California Supreme Court has not established a definitive test to determine whether a business practice is unfair in the context of consumer cases such as this one. Wahl v. Yahoo! Inc., No. 17-2745 BLF, 2017 WL 4098884, at *2 (N.D. Cal. Sept. 15, 2017). Nevertheless, three separate tests have emerged from the California Courts of Appeal that provide guidance on the issue. The first test requires that the public policy underlying the claim "must be tethered to specific constitutional, statutory or regulatory provisions." Drum v. San Fernando Valley Bar Ass'n, 182 Cal. App. 4th 247, 257 (2010). Under the second test, referred to as the "balancing test," courts analyze whether the alleged business

practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." Wahl, supra, at *2 (quoting Drum, supra, at 257); see also South Bay Chevrolet v. Gen. Motors Acceptance Corp., 72 Ca1.App.4th 861 (1999). The third test, which draws on the definition of "unfair" in section 5 of the Federal Trade Commission Act (15 U.S.C. §45, subd. (n)), requires that "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided" ("section 5 test"). Drum, supra, at 257. The Ninth Circuit, however, has expressly rejected the section 5 test for consumer actions in the absence of a clear holding from the California Supreme Court. Lozano v. AT&T Wireless Servs., Inc., 504 F.3d 718, 736 (9th Cir. 2007).

### a. Tethering Test

HP contends that the UCL claim for "unfair" business practices does not satisfy the "tethering test" set forth in Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163 (1999). In Cel-Tech, the California Supreme Court held that in actions by a competitor alleging anticompetitive practices the word "unfair" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." Id. at 187 & n.12.

Plaintiffs allege that HP engaged in unfair methods of competition and unfair trade practices that violate the UCL in at least the following respects:

> (a) With the intent and effect of stifling open and vigorous competition in the market for printer cartridges, HP devised and executed a material change to printers it had sold.
>
> (b) HP intentionally caused HP printers to stop functioning upon detection of cartridges manufactured by HP's competitors.
>
> (c) HP conditioned the operations of HP printers on their owners' purchases of HP products in another product market.

(d) HP tied HP printers' functionality to their owners' purchases of HP cartridges even though HP's Warranty expressly contemplates that printer owners may, will, and do replace depleted printer cartridges with cartridges not made or sold by HP.

(e) HP rendered printers it had sold inoperable without prior notice to their owners.

(f) HP printers remain inoperable as a result of HP's conduct unless their owners purchase and install cartridges made and sold by HP.

(g) By forcing Plaintiffs and Class members to purchase HP-branded ink cartridges to regain a working printer, HP has obtained an unfair advantage in the marketplace and hindered competition for third-party ink cartridges.

(h) By rendering the use of third-party ink cartridges in Class Printers obsolete, HP, through its firmware update, has unfairly usurped the business of third-party ink sellers and required Plaintiff and Class members to pay around three to six times more for replacement ink cartridges than they otherwise would have paid.

(i) To induce purchases of HP cartridges, HP provided misleading written messages on the screens of all of the failed Class Printers directing their owners to replace non-HP cartridges that, in fact, still contained ink and, but for HP's conduct would function in an ordinary manner.

(j) HP's conduct was designed to increase and maintain its share of the printer cartridge market due to conditions separate from competitive factors like pricing and quality of goods.

Complaint at ¶118.

The laundry list of alleged misconduct is insufficient to satisfy the Cel-Tech test. Plaintiffs do not identify which constitutional, regulatory or statutory provision to which the allegations are tethered. Instead, Plaintiffs allege generally that HP's "unfair methods of competition and unfair acts and practices are contrary to California law and policy" and that HP's conduct "contravenes the legislatively declared policy against unfair methods of business competition." Complaint at ¶117. These allegations are too vague. See also Palmer v. Apple Inc., No. 15-5808 RMW, 2016 WL 1535087, at *7 (N.D. Cal. Apr. 15, 2016) (allegation that defendant offended the "public policy in support of truth in advertising" insufficient to support UCL claim); Campos v. Bank of Am., Inc., No. 11-431 SBA, 2012 WL 2862603, at *9 (N.D. Cal. July 11, 2012) (public policy in

favor of home ownership insufficient to support UCL claim).

Plaintiffs argue that they have stated a UCL claim under the "unfair" prong because they have adequately pled "the central facts that characterize HP's anticompetitive behavior." Plaintiffs' Opposition at 11:9-10. Plaintiffs' position is not supported by any legal authority and inconsistent with the well-established Cel-Tech requirement to tether UCL claims under the "unfair" prong to specific constitutional, statutory or regulatory provisions. Plaintiffs next contend that they need not allege that HP's conduct violates the Cartwright Act. Although there is some merit to Plaintiffs' argument[7], Plaintiffs' allegations are nevertheless insufficient because they largely consist of legal conclusions. See Eclectic Props. East, LLC v. Marcus & Millichap Co., 751 F.3d 990, 996 (9th Cir. 2014) (allegations that are no more than legal conclusions are not entitled to an assumption of truth). For example, Plaintiffs allege a "market for printer cartridges," without alleging any facts regarding this market. Plaintiffs also do not allege facts to show how HP caused anticompetitive impact on that market. Generalized allegations of harm do not satisfy Cel-Tech's requirement that the effect of a defendant's conduct amounts to a violation of antitrust laws "or otherwise significantly threatens or harms competition." See Levitt v. Yelp! Inc., 765 F.3d 1123, 1136-7 (9th Cir. 2014).

The cases relied upon by Plaintiffs are distinguishable. Plaintiffs cite to Atlantic Refining Co. v. F.T.C., 381 U.S. 357 (1965) and F.T.C. v. Texaco, Inc., 393 U.S. 223 (1968), but these are FTC cases, not UCL cases. Plaintiffs also cite to State Farm Mut. Auto. Ins. Co. v. Dempster, 174 Cal.App.2d 418 (Ct. App. 1959), which is a contract and trade secrets case, not a UCL case.

---

[7] See e.g. Creative Mobile Technologies, LLC v. Flywheel Software, Inc., No. 16-2560 SI, 2016 WL 5815311, at *5 (N.D. Cal. Oct. 5, 2016) (UCL claim not barred just because it does not currently meet the standards for a claim under the Cartwright Act); Imperial Irrigation District v. California Independent System Operator Corp., No. 15-1576 AJB, 2016 WL 4087302, at *12 (S. D. Cal. Aug. 1, 2016) (allegations of monopolistic conduct that threatens competition sufficient to state unfair UCL claim, even though plaintiff failed to allege antitrust violation). But see Manwin Licensing Int'l S.A.R.L. v. ICM Registry, LLC, No. 11-9514 PSG, 2013 WL 12123772, at *8 (C.D. Cal. Feb. 26, 2013) ("Where a party's UCL allegations [under the 'unfair' prong] are based [solely] on alleged antitrust violations, the failure to allege an antitrust violation results in the failure to allege unfair competition.").

Case No.: 5:16-cv-05820-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT

20

United States District Court
Northern District of California

Plaintiffs' last citation is to <u>Northwest Power Prod., Inc. v. Omark Indus., Inc.</u>, 576 F.2d 83, 88 (5th Cir. 1978), a Sherman Act case, and is also not on point.  In sum, Plaintiffs' allegations are insufficient to satisfy the "tethering" test.

### b. "Balancing" Test

HP contends that Plaintiffs' Complaint fails to state facts explaining how and why the "balancing test" is satisfied.   In response, Plaintiffs contend that HP's firmware update was unscrupulous and harmful for the same reasons the firmware update was allegedly unfair.  Among other things, Plaintiffs allege that HP, without notice to Plaintiffs, rendered their printers inoperable by executing a remote firmware update and displayed messages on printer screens stating:  "There is a problem with the printer or ink system.  Turn printer off, then on.  If problem persists, contact HP."

When construed in a light most favorable to Plaintiffs, these allegations raise a reasonable inference that HP knowingly and purposefully rendered the printers inoperable and sent error messages that intentionally misled Plaintiffs into believing their printers or ink systems were malfunctioning for reasons unknown to HP, when HP knew and intended for its firmware update to render their printers inoperable.  Plaintiffs allege that there were reasonably available alternatives to HP's allegedly unfair conduct and provide examples of alternatives in their Opposition brief:  instead of disabling printers, HP could have created incentives for customers to use HP cartridges, disclosed any risks from using competing cartridges, or demanded that any manufacturers of counterfeit ink cartridges stop selling such products.  Plaintiffs' Opposition at 7:8-12.  These alternatives, however, are not set forth in the Complaint and will not be considered. <u>See</u> <u>Broam v. Bogan</u>, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003).  In the absence of factual allegations regarding HP's alternatives, Plaintiffs' UCL claim does not satisfy the "balancing" test.

### 3.  "Unlawful" Business Practices Under the UCL

For purposes of the UCL, "unlawful" practices are those forbidden by law.  <u>Saunders v.</u>

Super. Ct., 27 Cal.App.4th 832, 838 (1994). Plaintiffs allege that HP's conduct violates the FAL, the CLRA, the CFAA and the California Computer Crime Law. Plaintiffs' UCL unlawful claim is viable because the complaint states at least one theory of liability under each of these statutes.

### C. Plaintiff San Miguel's Texas Consumer Protection Claim (Claim 5)

Plaintiff San Miguel alleges that HP violated the Texas Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code Ann. §17.01, *et seq*.). The Court's analysis of the California state law claims applies equally to the Texas consumer protection claim and will not be restated herein. Moreover, San Miguel has failed to give HP notice of this claim prior to filing suit as required by §17.505(a). Accordingly, Claim 5 is dismissed with leave to amend.

### D. Plaintiff Lawty's Washington Consumer Protection Act Claim (Claim 6)

Plaintiff Lawty asserts a claim under the Washington Consumer Protection Act (Wash. Rev. Code Ann. §19.86.010, *et seq*.). The Court's analysis of the UCL claim applies to Lawty's Washington consumer protection claim. Claim 6 is dismissed with leave to amend.

### E. Plaintiff Ware's New Jersey Consumer Fraud Act Claim (Claim 7)

Plaintiff Ware asserts a claim under the New Jersey Consumer Fraud Act (N.J. Stat. Ann. §56:8-1, *et seq*.). The Court's analysis of the UCL, FAL and CLRA claims applies to Ware's New Jersey consumer fraud claim. Claim 7 is dismissed with leave to amend.

### F. Tortious Interference (Claim 11)

Plaintiffs' last claim is entitled "Tortious Interference with Contractual Relations and/or Prospective Economic Advantage." Complaint at p. 33. HP seeks dismissal of both torts without leave to amend for several reasons, including because neither tort applies to the consumer transaction context.

To state a tortious interference with contract claim, a plaintiff must show: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce breach or disruption of the contract; (4) actual breach or disruption; and (5) resulting damage." Name.Space, Inc. v. Internet Corp. for Assigned

Names and Numbers, 795 F.3d 1124, 1133 (9th Cir. 2015) (quoting Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp., 525 F.3d 822, 825 (9th Cir.2008)).

Here, Plaintiffs allege that their "sales transactions with third-party suppliers of compatible printer ink cartridges" involved various contractual conditions of sale, such as express and implied warranties, and included an implied warranty that the third-party cartridges Plaintiffs purchased were merchantable and fit for their ordinary use of printing documents. Complaint at ¶230. This generalized allegation is insufficient to allege a valid contract between plaintiff and a third party. R. Power Biofuels, LLC v. Chemex LLC, No. 16-716 LHK, 2016 WL 6663002, at *16 (N.D. Cal. Nov. 11, 2016) (allegation that plaintiff "was involved in business and economic relationships with major consumers of biodiesel" insufficient). Although the actual name of the party with whom a plaintiff has a contractual relationship need not be pled, "the plaintiff must allege a relationship with 'a specific, albeit unnamed' third party." Id. (citing Ramona Manor Convalescent Hosp. v. Care Enterps., 177 Cal.App.3d 1120 (1986)); c.f. Moore v. Apple, Inc., 73 F.Supp.3d 1191, 1202 (N.D. Cal. 2014) (plaintiff identified a valid existing contract with Verizon Wireless and the contractual duty to enable sending and receiving text messages). Nor have Plaintiffs alleged facts to establish the remaining elements of a claim for tortious interference with contractual relations.

Plaintiffs also fail to state a claim for intentional interference with prospective economic advantage. "A tortious interference with prospective economic advantage claim has the same elements (focusing instead on the existence and knowledge of a prospective economic relationship), but also requires that the defendant's conduct be 'wrongful by some legal measure other than the fact of interference itself.'" Name.Space, 795 F.3d at 1133 (quoting Kor. Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 131 Cal.Rptr.2d 29, 63 P.3d 937, 950 (2003) (internal quotation marks omitted)). Plaintiffs have not sufficiently alleged the existence and HP's knowledge of any actual prospective business relationship and accordingly, the claim is subject to dismissal.

**V. CONCLUSION**

For the reasons set forth above, Defendant HP's motion to dismiss is GRANTED IN PART. The following claims are DISMISSED WITH LEAVE TO AMEND: Claim 1 to the extent it is based upon "unfair" business practices; Claims 2 through 4 to the extent the claims are based upon allegedly false or misleading statements on HP's printer box, printer card and warranty booklet; Claims 5 through 7; Claim 8 for violation of the CFAA under subsections (B) and (C)[8]; Claim 9 to the extent it is based upon §502 (c)(2)-(3); and Claim 11. Claim 9 is DISMISSED WITH PREJUDICE to the extent it is based upon §502(c)(7) and (8). HP's motion to dismiss is DENIED in all other respects. Plaintiffs may file and serve an amended complaint consistent with this Order no later than April 13, 2018.

Given the passage of time and the anticipated filing of a second amended complaint, the Court invites the parties to stipulate to an extension of the deadlines set forth in the Case Management Order (Dkt. 79) and the briefing schedule and hearing date for Plaintiffs' motion or class certification, if needed.

**IT IS SO ORDERED.**

Dated: March 29, 2018

EDWARD J. DAVILA
United States District Judge

---

[8] Although it is questionable whether Plaintiffs can credibly and within the confines of Rule 11, Fed.R.Civ.P., allege that HP acted "without authorization," Plaintiffs' request for leave to amend is granted.

Case No.: 5:16-cv-05820-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT